LOUIS R. MILLER (State Bar No. 54141)
smiller@millerbarondess.com
AMNON Z. SIEGEL (State Bar No. 234981)
asiegel@millerbarondess.com
JESSE K BOLLING (State Bar No. 286267)
jbolling@millerbarondess.com
MILLER BARONDESS, LLP
1999 Avenue of the Stars, Suite 1000
Los Angeles, California 90067
Telephone:   (310) 552-4400
Facsimile:   (310) 552-8400

Attorneys for Plaintiff
HERRING NETWORKS, INC.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

HERRING NETWORKS, INC., a
California corporation,

                Plaintiff,

      v.

AT&T SERVICES, INC., a Delaware
corporation; and AT&T, INC., a
Delaware corporation,

                Defendants.

**CASE NO. CV 16-1636**

**COMPLAINT FOR:**

**(1) FRAUD BY CONCEALMENT;**

**(2) INTENTIONAL MISREPRESENTATION;**

**(3) NEGLIGENT MISREPRESENTATION;**

**(4) BREACH OF THE IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING;**

**(5) PROMISSORY ESTOPPEL;**

**(6) BREACH OF ORAL CONTRACT; AND**

**(7) BREACH OF IMPLIED IN FACT CONTRACT.**

**DEMAND FOR JURY TRIAL**

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

284180.4

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

Plaintiff Herring Networks, Inc. ("Herring") alleges against Defendants AT&T Services, Inc. and AT&T Inc. (collectively, "AT&T") as follows:

## INTRODUCTION

1.      There are two aspects to this case—two distinct instances of wrongdoing by the Defendants—and they are set forth below.

2.      *First*, this case is about AT&T's misrepresentations to—and concealment from—Herring to induce Herring to enter into an agreement in which AT&T distributed Herring's two channels on AT&T's U-verse TV platform.  When the parties negotiated and entered into their agreement, AT&T led Herring to believe that U-verse TV—AT&T's new television distribution service—would continue to expand and grow.  But unbeknownst to Herring, AT&T had decided to acquire DirecTV and wind-down U-verse, *i.e.*, move AT&T's pay-TV customers to the DirecTV system.  AT&T paid $65 billion (with debt) for DirecTV and does not want to have two competing television services.

3.      AT&T did not tell Herring about its intent to wind down its U-verse TV service.  AT&T's concealment—and its violations of the bargained-for benefits in the parties' existing contract—has harmed Herring's business; and Herring seeks damages as a result.

4.      *Second*, this case is also about AT&T promising to put Herring's channels on DirecTV in return for Herring's support and lobbying with governmental regulators in favor of AT&T's $65 billion acquisition of DirecTV (the "Acquisition").  The Acquisition quadrupled the size of AT&T's television business and made AT&T the largest pay-TV distributor in the country.  After AT&T got Herring's support, and the Acquisition was completed, AT&T reneged on its promise and agreement to put Herring's channels on DirecTV.

5.      The facts supporting these claims are set forth below.  The First, Second, Third and Fourth Causes of Action (fraud by concealment, intentional misrepresentation, negligent misrepresentation and breach of the implied covenant

of good faith and fair dealing) relate to the first part of the case: AT&T's misrepresentations and concealment with respect to, and in violation of, the parties' existing U-verse channel carriage contract.

6. The Fifth, Sixth and Seventh Causes of Action (promissory estoppel, breach of oral contract and breach of implied in fact contract) relate to the second aspect of this case: AT&T reneging on its agreement to distribute Herring's networks on DirecTV, which was made in order to obtain Herring's support for the Acquisition with governmental regulators.

7. These wrongdoings are part and parcel of AT&T's scheme to take control of, and dominate, the television business, at the expense of and to the detriment of independent television channel owners like Herring.

## PARTIES AND JURISDICTION

8. Plaintiff Herring Networks, Inc. is a California corporation, with its principal place of business in San Diego, California.

9. Defendants AT&T Inc. and AT&T Services, Inc. are Delaware corporations, with their principal places of business in Dallas, Texas. AT&T Services, Inc. also has an office in Los Angeles, California.

10. AT&T Inc. is the parent company of AT&T Services, Inc. AT&T Inc. is responsible for establishing company-wide corporate policies and practices for AT&T Services. AT&T Inc.'s plans for AT&T Services are created by AT&T Inc., approved by the AT&T Inc. Board of Directors and carried out by AT&T Services, Inc.

11. Top executives at AT&T's Inc.'s subsidiaries, such as AT&T Services, Inc., report directly to AT&T Inc. Indeed, the former President of Content and Advertising Sales at AT&T Services (the top position at AT&T Services), Aaron Slator, reported to John Stankey, an executive at AT&T Inc.; Stankey, in turn, reported to Randall Stephenson, the Chairman and CEO of AT&T Inc. Prior to reporting to Stankey, Slator reported to Lori Lee, who, like Stankey, is an officer at

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

1    AT&T Inc.  Stephenson was directly in Slator's chain of command, and Slator dealt

2    directly with Stephenson as well.

3         12.    AT&T Inc. was responsible for planning, orchestrating and

4    consummating the acquisition of DirecTV, which is now a subsidiary of AT&T Inc.

5    AT&T Inc. was also responsible for promising Herring distribution on DirecTV if

6    Herring supported the Acquisition with governmental regulators.  As set forth

7    below, AT&T Inc. instructed and authorized Aaron Slator to promise Herring

8    distribution on DirecTV in exchange for Herring's lobbying for, and support of, the

9    Acquisition.

10        13.    In addition to Aaron Slator, another AT&T Inc. executive, James

11   Cicconi, AT&T Inc.'s Senior Executive Vice President of External and Legislative

12   Affairs, also promised Herring distribution on DirecTV in return for lobbying

13   regulators for approval of the DirecTV Acquisition.  Slator and Cicconi represented

14   to Herring that they had authority from AT&T corporate headquarters in Dallas,

15   Texas, to agree that Herring would obtain distribution on DirecTV once the

16   Acquisition was completed.

17        14.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332;

18   there is complete diversity of citizenship between Plaintiff and Defendants; and

19   there is more than $75,000 in controversy.  Plaintiff is a California corporation with

20   its principal place of business in California; Defendants are Delaware corporations

21   with their principal places of business in Texas.

22        15.    Because AT&T Services, Inc. has an office in and operates out of Los

23   Angeles, California, and because much of the wrongful conduct committed by

24   AT&T took place in Los Angeles, venue is proper in this Court under 28 U.S.C. §

25   1391.

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

3

COMPLAINT

# FACTS

**A.    Herring Networks**

16.     Herring is an independent, family-owned television programming company, headquartered in San Diego, California.  CEO Robert Herring Sr. ("Robert") started the company in 2003 with his sons, Charles Herring ("Charles") and Robert Herring Jr. ("Bobby").  Charles is the President of Herring, and Bobby is General Manager.

17.     Herring owns and operates two television networks: A Wealth of Entertainment ("AWE"); and One America News Network ("OAN").

18.     AWE is a lifestyle and entertainment channel, which Herring launched in 2004.  It airs a wide range of programming, including travel-related series, automotive shows, international news, documentaries, and live championship boxing.  AWE has demonstrated excellent performance since its inception.  It is distributed domestically on 150 cable systems; has received regional Emmy awards and nominations for its productions; its live championship boxing programming has received multiple recognitions; and its ratings outperform DirecTV's competing, affiliated channel, Audience Network.

19.     OAN, launched on July 4, 2013, is a news channel that delivers timely national and international news 24 hours a day.  It features political analysis programming, political talk shows, and special documentary-style reports.  OAN provides more live news than any other network.  In just a few years, OAN has become the fourth-highest rated national news network and is greatly outperforming other emerging cable news networks.  OAN's ratings have been consistently outstanding.  In fact, OAN has outperformed Al Jazeera America, Fusion and Bloomberg combined.

**B.    AT&T Launches U-verse TV And Carries Herring's Channels**

20.     AT&T is the second largest provider of mobile telephone and the largest provider of fixed wireline telephone in the United States.  It also provides

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

1  broadband internet and subscription television services.  AT&T is the 16th-largest

2  non-oil company in the world.

3      21.    In 2006, AT&T set out to broaden its operations and become a

4  television distributor, known as a multichannel video programming distributor

5  ("MVPD").  To that end, AT&T launched AT&T U-verse in June 2006.  U-verse

6  was AT&T's first entry into the television distribution business.

7      22.    Until recently, AT&T and Herring have had an ongoing, positive

8  relationship.  AWE, launched two years before U-verse was created, was one of the

9  original channels on U-verse in 2006 and has been continuously distributed on U-

10  verse since then.

11      23.    When Herring planned to create a new cable television network in late

12  2012, it asked AT&T what type of new channel it should launch: a news network; or

13  a boxing channel.  AT&T advised Herring to develop a news network and stated

14  that, once developed, the new network (which became OAN) would be distributed

15  on U-verse.

16      24.    Herring thus immediately began developing OAN and launched OAN

17  the following year, in July 2013.  This was a substantial undertaking and a multi-

18  million dollar investment.

19      25.    AT&T provided carriage to OAN on U-verse.  Owners of television

20  networks or channels, like Herring, generate revenue through carriage (*i.e.*,

21  distribution) agreements with MVPDs.  The MVPD customers, or subscribers, pay a

22  fee to get access to a variety of networks; and in turn, the MVPD pays the networks

23  a licensing fee to distribute their content.

24      26.    On April 10, 2014, AT&T and Herring entered into a Network

25  Affiliation Agreement (the "Carriage Agreement").  In the Carriage Agreement,

26  AT&T agreed to extend carriage for AWE and begin carrying OAN on U-verse.

27  AT&T agreed to carry both channels for a customary five-year period with one-year

28  renewals and to pay Herring a monthly licensing fee of $0.18 cents per subscriber.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**C.** **AT&T Concealed Its Plan To Move Subscribers From U-verse To DirecTV**

27.     AT&T concealed its plans to wind down U-verse.  Instead, when the parties negotiated the Carriage Agreement, AT&T led Herring to believe, and represented, that AT&T was committed to expanding U-verse and increasing its subscriber base.

28.     In negotiating the Carriage Agreement, in or about early 2014, AT&T's Ryan Smith, Vice President of Content at AT&T Services, Inc., met with Charles Herring in Century City, California.  Smith stated that AT&T expected U-verse TV to challenge and surpass Time Warner Cable (TWC).  At the time, AT&T had less than half as many subscribers as TWC (approximately 5.3 million compared to TWC's 11.4 million subscribers).  Smith said to Charles that AT&T was continuing U-verse's expansion to additional markets and capturing more market share in the markets where it already launched.  Smith boasted to Herring about AT&T's ambitious expansion plans; and in fact, AT&T U-verse's subscribers and revenues had been continuously growing in 2012 and 2013.

29.     Unbeknownst to Herring, AT&T planned to acquire DirecTV and move customers from U-verse to DirecTV's platform.  But AT&T did not disclose its plan to Herring; instead, AT&T told Herring (and the public) just the opposite.

30.     AT&T concealed this plan and induced Herring to sign a new Carriage Agreement.  AT&T's deception worked.

31.     During the parties' negotiations of the Carriage Agreement, there was a standard clause that would have required AT&T to put Herring's networks on any MVPD that AT&T subsequently acquired (the "Acquired Systems Clause").  However, AT&T changed this provision.  AT&T inserted new language that negated the Acquired Systems Clause.  AT&T's change excused any obligation by AT&T to carry Herring's networks on a newly-acquired MVPD system, such as DirecTV.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

32.     Herring was not aware of AT&T's plan to move from U-verse subscribers over to DirecTV, so Herring signed the Carriage Agreement with AT&T's change to the Acquired Systems Clause.  Herring would not have signed the Carriage Agreement with this language had Herring known AT&T's plans.

33.     AT&T's representations to Herring were consistent with its public statements regarding AT&T's plans to grow U-verse, and Herring relied on them. For example, in its Annual Report, AT&T's CEO stated:

> During 2013, we [AT&T] continued to expand our offerings of U-verse high speed internet and TV services.  As of December 31, 2013, we are marketing U-verse services to approximately 27 million customer locations (locations eligible to receive U-verse service).  As of December 31, 2013, we had 10.7 million total U-verse subscribers (high-speed Internet and video), including 10.4 million Internet and 5.5 million video subscribers (subscribers to both services are only counted once in the total).  As part of Project Velocity IP (VIP), we plan to expand our IP-broadband service to approximately 57 million customer locations, including U-verse services to a total of 33 million customer locations.  We expect to be substantially complete in the 2015 and 2016 timeframe.

34.     AT&T's statements were deceptive.  Instead of expanding U-verse, AT&T planned to contract it.  AT&T also hid its plan from regulators during the Acquisition approval process.  It was not until after governmental agencies approved the DirecTV transaction that AT&T came clean about its plan to wind down U-verse in favor of the DirecTV platform.

35.     AT&T is now aggressively soliciting U-verse subscribers to move to DirecTV.  Indeed, using AT&T's logo, DirecTV sent U-verse TV customers a solicitation offering money to move to DirecTV.  AT&T also has told U-verse subscribers that the networks or channels they have on U-verse will be available on DirecTV.  But Herring's networks are not on DirecTV.

36.     AT&T is not carrying Herring's networks on DirecTV.  U-verse customers who switch to DirecTV are unable to tune into Herring's programming.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

37.     AT&T has publicly announced that it plans to make DirecTV its TV service and wind down U-verse.  AT&T's effort to phase out U-verse has been successful: U-verse TV has lost approximately 325,000 subscribers since the Acquisition was completed, while DirecTV has gained more than 200,000 customers during the same time.

38.     This has severely harmed Herring.  Under the Carriage Agreement, AT&T pays Herring a licensing fee based on the number of U-verse subscribers. Fewer subscribers mean less revenue for Herring.  Because of AT&T's conduct, Herring is being distributed to fewer subscribers and receiving less in licensing fees.

39.     AT&T is purposefully eroding the U-verse subscriber base on which Herring depends for revenues.  AT&T's conduct is not only contrary to the representations it made to Herring, it also violates the bargained-for benefits of the Carriage Agreement.  AT&T is crippling Herring's business.

40.     The allegations below relate to the second aspect of this case: AT&T refusing to comply with its promises to carry Herring's channels on DirecTV in exchange for Herring's support for governmental approval of the DirecTV Acquisition.

**D.     AT&T Contemplates Purchasing A Stake In Herring**

41.     Prior to the April 10, 2014 Carriage Agreement (and afterwards), the relationship between Herring and AT&T was so close that, in 2013, AT&T contemplated acquiring an equity stake in Herring to get Herring's channels on DirecTV.

42.     AT&T's Aaron Slator, then-President of Content and Advertising Sales, advised Herring that AT&T had previously negotiated a "Put Right" with the then-separate MVPD, DirecTV.  The Put Right provided AT&T with the right to require DirecTV to carry AT&T "affiliated channels."  An "affiliated channel" is one in which an MVPD has an ownership interest.  An "independent programmer" such as Herring, on the other hand, is one that is not owned by a MVPD.

43.     Slator proposed that AT&T acquire a 5% ownership stake in Herring so that OAN and AWE would become AT&T affiliated channels.  Once that happened, Slator agreed that AT&T would "put" the channels to DirecTV and thereby obtain carriage for Herring on DirecTV.

44.     Recognizing the potential for growth, Herring accepted AT&T's offer. Herring agreed to provide AT&T with a 5% equity stake in Herring at no cost to AT&T.  In return, AT&T agreed to exercise its Put Right to gain carriage for Herring on DirecTV.

45.     On February 6, 2014, Charles had a call with Landon Coe, AT&T's then-Director of Content Acquisition, regarding the Put Right.  Coe told Charles that AT&T planned to move forward with the Put Right.  Coe stated the relevant materials were being finalized and would soon be presented to Randall Stephenson, Chairman and CEO of AT&T Inc.  AT&T Services and AT&T Inc. worked hand-in-hand in offering and formulating AT&T's equity stake in Herring.

**E.     AT&T Reneges On The "Put" But Promises Herring A New Deal For Carriage On DirecTV**

46.     In May 2014, AT&T and DirecTV publicly announced AT&T's plan to acquire DirecTV for $65 billion (inclusive of assumption of debt).

47.     At the time of the announcement, DirecTV was the second largest pay-TV operator in the United States, serving approximately 20 million television customers.  AT&T's U-verse was the fifth-largest pay-TV operator, serving approximately 5.7 million subscribers.  If the Acquisition was approved by governmental regulators, AT&T would quadruple the size of its pay television business and become the largest pay television company in the United States, with nearly 26 million subscribers.

48.     But the AT&T/DirecTV acquisition faced a stiff test to obtain regulatory approval by the Federal Communications Commission (FCC) and the U.S. Department of Justice (DOJ).

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

49.     The FCC and DOJ, and Congress too, were closely scrutinizing this transaction—as well as the then-pending merger between two other pay-tv giants, Comcast and Time Warner Cable (TWC)—to determine whether they were in the public interest.  The Comcast/TWC merger was earlier in time and scheduled to come up for approval before the AT&T/DirecTV merger.  The Comcast-TWC Merger could have interfered with AT&T's ability to consummate the Acquisition of DirecTV.  Thus, AT&T's objective was to obstruct the Comcast/TWC merger, while pushing through approvals for its acquisition of DirecTV.

50.     In order to obtain the necessary governmental approvals, AT&T needed support and lobbying from independent programmers, such as Herring.  The FCC has a Congressional mandate to foster a diverse, robust and competitive marketplace for video programming, which includes ensuring fair and equal treatment for independent programmers.  The government regulators take into account that independent programmers, like Herring, face serious impediments when it comes to acquiring program carriage and find it difficult to obtain fair or reasonable terms.

51.     The FCC was also aware of MVPDs' favoritism for their own affiliated programming to the detriment of independent programmers.  Indeed, in the previous Comcast/NBCUniversal merger in 2009, the FCC made its approval of the merger contingent on Comcast's commitment to the FCC to add carriage for a certain number of independent networks post-merger and treat the independents reasonably and fairly when it came to carriage decisions.  Recently, the FCC issued a Notice of Inquiry concerning "Promoting the Availability of Diverse and Independent Sources of Video Programming," wherein the FCC acknowledged the difficulties faced by independent programmers and invited comment as to how it can help ensure that independent programmers obtain carriage on MVPDs, like DirecTV.

52.     During the AT&T/DirecTV merger process, the issues facing independent programmers, such as Herring, were raised to governmental regulators.  The FCC conducted an analysis of the television marketplace and examined the

1  challenges and barriers to expanding the availability of independent programming

2  on MVPDs.  AT&T was well aware that the regulators were considering the

3  challenges facing independent programmers in determining whether to approve the

4  DirecTV Acquisition as being in the public interest.  AT&T's history of dealing

5  with independents was thus going to be under the microscope in the regulatory

6  approval process.

7      53.    AT&T could not afford to fail in another acquisition attempt.  A few

8  years earlier, AT&T had to pay a $4 billion breakup fee when its $39 billion

9  takeover attempt of T-Mobile failed to obtain regulatory approval.  Indeed, the DOJ

10 brought a lawsuit to block the merger.  AT&T's top executives, Randall Stephenson

11 (Chairman and CEO) and James Cicconi, were criticized for AT&T's botched

12 attempt to acquire T-Mobile.  It was critical for AT&T get the DirecTV deal right.

13     54.    In order to obtain approval, AT&T knew that it needed an ally among

14 independent programmers to address these issues, so it turned to Herring.  Herring

15 had one of the original channels launched on U-verse, and the parties had a close

16 relationship.  AT&T executives attended paid-for vacations with Herring, and the

17 parties regularly interacted.  AT&T, as the distributor for Herring's programming,

18 had power over Herring.  Herring knew that it had to stay in the good graces of

19 AT&T.

20     55.    Shortly after May 18, 2014 when AT&T announced its intention to

21 acquire DirecTV, Charles Herring visited AT&T's Los Angeles office.  At the

22 meeting, AT&T's President, Aaron Slator, stated to Charles that because of the

23 negotiations regarding the Acquisition, AT&T Inc.'s Randall Stephenson did not

24 want to move forward with the Put Right with Herring.  According to Slator,

25 Stephenson stated that he did not want the Put Right to affect the DirecTV

26 Acquisition and did not want to address it with his then-counterpart at DirecTV,

27 Chairman and CEO Mike White.  Slator stated that although he felt badly about

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1  AT&T not doing the Put Right deal, he had been authorized by his superiors at

2  AT&T Inc. to offer a better deal to get Herring's networks on DirecTV.

3      56.    Slator stated that AT&T needed independent cable television networks,

4  like Herring, to publicly lobby for and support the Acquisition.  Slator proposed that

5  if Herring publicly supported AT&T during the Acquisition process, AT&T would

6  ensure that DirecTV carried Herring's networks upon completion of the Acquisition.

7  Herring's OAN and AWE were (and are) the two highest-rated channels on U-verse

8  that are not carried on DirecTV.

9      57.    Slator said that the terms of carriage on DirecTV would be similar to

10  the Carriage Agreement Herring and AT&T had just executed the prior month.  The

11  deal, which Slator stated would be reduced to writing after the Acquisition was

12  completed, would be for a customary five-year term, with automatic 12-month

13  renewals (like the existing Carriage Agreement).

14     58.    Slator said that there would be a reduction in the monthly per

15  subscriber rate of $0.18 that AT&T was paying.  Slator stated that he had been

16  instructed by Stephenson and Stankey, AT&T Inc. officers, that once the

17  Acquisition was completed, the newly-combined AT&T/DirecTV would have to

18  reduce the subscriber fees paid to Herring.

19     59.    Thus, Slator said that instead of paying $0.18 per subscriber, per the

20  existing Carriage Agreement, AT&T/DirecTV would pay Herring less per

21  subscriber, such that Herring would receive $20-25 million in licensing revenues per

22  year from DirecTV.  Slator stated to Herring that carriage on DirecTV would be

23  very lucrative for Herring; and he said that, unlike the Put Right, Herring would not

24  have to give up an ownership stake in its company to obtain distribution on

25  DirecTV.

26     60.    Charles accepted Slator's terms.  The parties struck an agreement:

27  Herring would do as AT&T instructed in support of governmental approval of the

28  Acquisition; in exchange, if the Acquisition was completed, Herring would obtain

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**12**

1   distribution for OAN and AWE on DirecTV.  Immediately after his discussion with

2   Slator, Charles notified AT&T executive Ryan Smith about what Slator had told

3   him.

4         61.    In November 2014, Herring's CEO, Robert Herring Sr., met with Slator

5   at AT&T's office in Los Angeles.  Slator reiterated AT&T's promise that DirecTV

6   would carry OAN and AWE post-Acquisition.  Slator again indicated that the

7   material terms of the carriage deal with DirecTV would be the same as the 2014

8   carriage agreement between Herring and AT&T, including a customary five-year

9   term with one-year renewals.  Slator also reiterated that that the subscriber fees

10   would be reduced from $0.18 per month (per the existing Carriage Agreement) to

11   $0.12 per month based on 85% of DirecTV's 20 million subscribers, totaling $20 to

12   $25 million per year in licensing fees to Herring.

13         62.    Herring agreed to the reduced subscriber fees because DirecTV's 20

14   million-plus subscriber base would result in Herring's networks being distributed to

15   a much larger audience, which would increase Herring's total revenues.  Slator

16   explained to Herring the pressure he was receiving from his superiors, Stankey and

17   Stephenson, to rein in licensing fees.  Despite the reduction of the subscriber rate,

18   Slator said that once the Acquisition was completed, Herring would receive $20 to

19   $25 million per year in licensing fees from carriage on DirecTV.  Slator

20   memorialized these terms in his own handwriting.  Slator handwrote the figures and

21   handed the document to Herring.

22         63.    AT&T's promise was tremendous for Herring—Herring had not yet

23   obtained channel carriage on DirecTV; carriage with DirecTV would have increased

24   Herring's subscriber base by approximately 20 million (the number of DirecTV

25   customers); and DirecTV would pay Herring, according to AT&T's own statements,

26   in excess of $100 million in licensing fees over the five-year term.

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

**F.     Herring Provides Substantial Support For AT&T's DirecTV Acquisition**

64.     At AT&T's direction and in reliance on the parties' agreement, Herring did everything AT&T asked to obtain governmental approval of the Acquisition. Herring trusted and relied on AT&T's promise that if the DirecTV Acquisition was completed, AT&T would provide Herring with carriage on DirecTV.

65.     On behalf of independent programmers, Herring aggressively lobbied—and publicly set a positive tone—for the Acquisition with the FCC, DOJ, Senators and Representatives on Capitol Hill, consumer activist groups and the press.  Herring also supported AT&T's efforts to block the competing Comcast/TWC merger.  Herring did as AT&T directed and performed its end of the bargain.

66.     Herring actively supported the Acquisition in Washington D.C.  At AT&T's direction, Herring spent substantial time, and made substantial effort, as follows:

- Lobbying to defeat the proposed merger between AT&T-rivals Comcast and TWC.  The timing of regulatory approval for the Comcast-TWC merger was ahead of the Acquisition and could have interfered with AT&T's Acquisition of DirecTV;

- Hiring political consultant PC Koch ("Koch"), a well-connected legislative strategist in Washington D.C., to help lobby for the Acquisition and against the Comcast-TWC merger.[1]  Herring paid Koch a substantial amount of money for his efforts;

---

[1]   Koch's brother is married to Dorothy Bush Koch.  Dorothy is the daughter of the 41st President of the United States George H.W. Bush and former First Lady Barbara Bush.  She is the sibling of George W. Bush, the 43rd President.  Koch is well-connected on the Hill.  His father was considered one of the all-time best "K Street" lobbyists in Washington D.C.  Koch served as a telecommunications lobbyist for AT&T.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

- Setting a positive tone regarding the Acquisition with the press;
- Making multiple visits to the FCC and DOJ to express support for the Acquisition;
- Lobbying key members of Congress to support the Acquisition;
- Attending a $50,000 per person dinner hosted by then-Speaker of the House John Boehner, to lobby for the Acquisition; and
- Advocating AT&T's fair treatment of independent networks to the FCC and the DOJ.

67.    Herring's support of AT&T ran deep.  Herring invited AT&T to utilize OAN's news programs to cast a positive light on the Acquisition and advocated for other issues affecting AT&T's business.

68.    Herring filed briefs with the FCC in support of the Acquisition and against the Comcast/TWC merger, including one that was ghostwritten by AT&T. On September 15, 2014, Koch sent Charles an email attaching a draft filing for the FCC entitled "Comments of Herring Networks, Inc."  The FCC filing sent by Koch championed the DirecTV Acquisition and argued strenuously against approval of the Comcast/TWC deal.  The proposed filing juxtaposed the two then-pending mergers:  "Because the proposed transactions are not equal, the FCC should rapidly approve AT&T's acquisition of DIRECTV while providing careful scrutiny to Comcast's acquisition of Time Warner Cable."  It concluded that "the FCC should prioritize approval of the AT&T-DIRECTV transaction and then turn its attention to the much more complicated and troublesome merger between Comcast and Time Warner Cable."

69.    To keep its end of the bargain, Herring signed the FCC filing and returned it to Koch within hours—all for the benefit of AT&T.

70.    Two days later on September 17, 2014, Charles met Koch for lunch in D.C.  Koch acknowledged that AT&T wrote the FCC filing for Herring.  Koch advised Charles of the activities that were going on "behind the scenes" to get the

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400      FAX: (310) 552-8400

AT&T/DirecTV merger approved and the Comcast/TWC merger blocked, including discussions among then-Speaker of the House, John Boehner, AT&T CEO Randall Stephenson and James Cicconi, AT&T's Senior Executive Vice President of External and Legislative Affairs.

71.     Cicconi, an AT&T Inc. officer who reported directly to CEO Stephenson, was responsible for leading AT&T Inc.'s efforts to obtain governmental approval of the Acquisition.  Cicconi also directed Herring's activities to promote the DirecTV acquisition and oppose the Comcast/TWC transaction.  Herring worked hard for AT&T in the regulatory approval process, and Herring did this because of AT&T's promise of carriage on DirecTV.

72.     Koch and Cicconi instructed Herring that not everyone at AT&T should be privy to AT&T and Herring's activities concerning the Acquisition, including even lower-level executives at AT&T.  On October 1, 2014, Koch advised Charles that Tim McKone, Executive Vice President at AT&T, who "runs AT&T's lobby shop … is definitely not a person to discuss our activities with.  Cicconi has not."  Charles met McKone the next day at the $50,000 per person dinner for John Boehner, in which Charles sat at a table with Speaker Boehner to advocate for the Acquisition; Charles complied with AT&T's instruction not to discuss these dealings.

73.     On October 13, 2014, Charles met Cicconi at the Hyatt Hotel in Washington D.C. for breakfast.  Cicconi thanked Charles for Herring's help with the Acquisition.  Cicconi confirmed that AT&T would get Herring's networks carriage on DirecTV after the Acquisition.  This was the same promise Slator had made to Herring when AT&T reneged on the Put Right deal.

74.     Cicconi asked Charles to complete another assignment for AT&T. Specifically, Cicconi requested that Herring solicit other independent programmers to support the Acquisition.  Pursuant to its agreement with AT&T to support the Acquisition, Herring complied with AT&T's request.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

75.     Over the next several weeks, Herring made substantial efforts to garner support from other independently owned networks—all for AT&T's benefit.  On October 27, 2014, Herring updated Cicconi on its efforts: "I've reached out directly . . . to senior affiliate [sic] and top management at over 20 independent networks." Charles then advised Cicconi of the status of his discussions with each of those independent programmers.  Cicconi responded: "Thanks so much, Charles."

**G.     The Acquisition Closes, But AT&T Refuses To Perform**

76.     On July 24, 2015, the FCC announced its approval of the Acquisition, and the AT&T/DirecTV merger was consummated.  After the Acquisition, the relevant portion of the AT&T family was organized in the following manner:



77.     AT&T made John Stankey the CEO of AT&T Entertainment Group, responsible for leading its combined DirecTV and AT&T home solutions operations.  Stankey, an AT&T Inc. officer, continues to report to CEO Stephenson.

78.     With nearly 26 million subscribers, AT&T is now in control of a huge percentage of the market for television subscribers and channel carriage.

79.     On August 27, 2015, Robert and Charles Herring met with DirecTV to discuss carriage for their channels, OAN and AWE.  Herring gave the DirecTV executives a presentation describing, among other things, the promises from Slator and Cicconi concerning carriage on DirecTV post-Acquisition and Herring's substantial performance in reliance on the parties' agreement.  The DirecTV people at the meeting claimed that they were not aware of the parties' agreement and terminated the meeting.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

80.     Multiple high-level AT&T executives went to Herring and promised that if Herring provided support for the Acquisition, AT&T would distribute Herring's channels on DirecTV once the Acquisition was completed.  Herring agreed and performed.  But once AT&T completed the Acquisition of DirecTV, AT&T refused to honor its promises.

## FIRST CAUSE OF ACTION

### (Fraudulent Concealment)

### (Plaintiff against all Defendants)

81.     Plaintiff repeats and re-alleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

82.     In April 2014, AT&T and Herring entered into Carriage Agreement.  In this agreement, AT&T agreed to extend carriage for AWE and to begin carrying OAN on U-verse.  AT&T agreed to carry both channels for five years at a total monthly rate of 18 cents per subscriber.

83.     Before, during, and after the 2014 Carriage Agreement, AT&T represented to Herring that it was committed to expanding U-verse TV.  But this representation was false.  Specifically, AT&T planned to acquire DirecTV and shift U-verse's subscribers to the DirecTV platform.  AT&T did not tell Herring about its plan until well after the DirecTV Acquisition was completed.

84.     This fact is highly material.  Had Herring known that AT&T planned to erode its subscriber base, Herring would have acted differently when negotiating the April 2014 Carriage Agreement.  Herring would not have signed the Carriage Agreement with the fundamental change to the Acquired Systems Clause that AT&T made at the last minute.  AT&T induced Herring to agree to alter/remove language in the Carriage Agreement that would have required AT&T to carry Herring on DirecTV.

Miller Barondess, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400    FAX: (310) 552-8400

85.     Had Herring known the truth, it would not have so agreed.  In addition, Herring would not have advocated for AT&T in D.C. if Herring knew that AT&T intended to wind-down U-verse video.  Herring also would not have increased its production costs, had AT&T disclosed its plan to move U-verse subscribers to the satellite platform.

86.     AT&T concealed this fact with the intention to induce AT&T to enter into the April 2014 Carriage Agreement.

87.      As a direct, foreseeable and proximate result of Defendant's fraud, Plaintiff has suffered and continues to suffer damages in excess of $100 million, or an amount to be proven at trial.

88.     The aforementioned acts of AT&T were willful and malicious in that they were done with the deliberate intent to injure Herring.  AT&T's conduct was despicable and subjected Herring to unjust hardship in conscious disregard of Herring's rights.  AT&T's conduct was malicious, fraudulent and oppressive. Accordingly, Herring is entitled to an award of punitive or exemplary damages in an amount sufficient to punish AT&T and make an example of it.

## SECOND CAUSE OF ACTION

### (Intentional Misrepresentation)

### (Plaintiff against all Defendants)

89.     Plaintiff repeats and re-alleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

90.     As stated in detail above, in early 2014, AT&T executive Ryan Smith represented to Herring that AT&T intended to continue to grow U-verse and that its expansion plans would cause U-verse to more than double its size and have more subscribers than TWC.  AT&T's representations were also made in public filings pre-dating the Carriage Agreement by AT&T Inc.'s top executives, which Herring relied on.  At the time AT&T made these statements, AT&T knew that its

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400     FAX: (310) 552-8400

1  statements were false and/or made them recklessly without regard for their truth.

2  AT&T's plan to acquire DirecTV was already in the works when the parties were

3  negotiating the Carriage Agreement in 2014, and AT&T knew that once it acquired

4  DirecTV, U-verse video would be wound down.

5      91.   AT&T made these fraudulent statements with the intent to induce

6  Herring to sign the Carriage Agreement with language that excused AT&T from any

7  obligation to carry Herring's networks on an MVPD that AT&T acquires, such as

8  DirecTV.

9      92.   Relying on AT&T's misrepresentations, Herring proceeded to sign the

10  Carriage Agreement with such language.  Herring also aggressively lobbied for

11  AT&T in D.C. in reliance on AT&T's statements that it would expand U-verse.

12  And Herring expended substantial money and resources on strengthening its

13  program offerings on OAN and AWE in reliance on AT&T's false representations.

14      93.   Now, because of AT&T's misrepresentations, Herring is stuck on a

15  dying U-verse platform that is bleeding subscribers while AT&T carries out its

16  strategy to move customers to DirecTV.

17      94.   As a direct, foreseeable and proximate result of Defendant's fraudulent

18  statements, Plaintiff has suffered and continues to suffer damages in excess of $100

19  million, or an amount to be proven at trial.

20      95.   The aforementioned misrepresentations of AT&T were willful and

21  malicious in that they were done with the deliberate intent to injure Herring.

22  AT&T's conduct was despicable and subjected Herring to unjust hardship in

23  conscious disregard of Herring's rights.  AT&T's conduct was malicious, fraudulent

24  and oppressive.  Accordingly, Herring is entitled to an award of punitive or

25  exemplary damages in an amount sufficient to punish AT&T and make an example

26  of it.

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**THIRD CAUSE OF ACTION**

**(Negligent Misrepresentation)**

**(Plaintiff against all Defendants)**

96.     Plaintiff repeats and re-alleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

97.     As stated in detail above, in early 2014, AT&T executive Ryan Smith represented to Herring that AT&T intended to continue to grow U-verse and that its expansion plans would cause U-verse to more than double its size and have more subscribers than TWC.  AT&T's representations were also made in public filings pre-dating the Carriage Agreement by AT&T Inc.'s top executives, which Herring relied on.  At the time AT&T made those representations, they were knowingly false, were made without knowledge as to their truth or falsity, or were made under circumstances in which AT&T should have known of their falsity.  AT&T's plan to acquire DirecTV was already in the works when the parties were negotiating the Carriage Agreement in 2014, and AT&T knew that once it acquired DirecTV, U-verse video would be wound down.  AT&T failed to disclose these material facts to Herring.

98.     Because AT&T was aware of its own plans to acquire DirecTV and move to one pay-TV system, AT&T had no good faith basis for representing to Herring that AT&T U-verse would continue to grow.

99.     AT&T had a duty to disclose material information because it made partial disclosures that were likely to mislead while omitting other material facts. Because AT&T disclosed its plan to expand U-verse TV, AT&T had a duty to disclose all material information, including its plan to acquire a large satellite MVPD, so that Herring could have an accurate picture before entering into the Carriage Agreement.  The material information regarding AT&T's plans with DirecTV was not accessible to Herring.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

100.   AT&T made these misrepresentations with the intent to induce Herring to sign the Carriage Agreement with language that excused AT&T from any obligation to carry Herring's networks on an MVPD that AT&T acquires, such as DirecTV.

101.   Relying on AT&T's misrepresentations, Herring proceeded to sign the Carriage Agreement with such language.  Herring also aggressively lobbied for AT&T in D.C. in reliance on AT&T's statements that it would expand U-verse. And Herring expended substantial money and resources on strengthening its program offerings on OAN and AWE in reliance on AT&T's false representations.

102.   Now, because of AT&T's misrepresentations, Herring is stuck on a dying U-verse platform that is bleeding subscribers while AT&T carries out its strategy to move customers to DirecTV.

103.   As a direct, foreseeable and proximate result of Defendant's fraudulent statements, Plaintiff has suffered and continues to suffer damages in excess of $100 million, or an amount to be proven at trial.

## FOURTH CAUSE OF ACTION

### (Breach of the Implied Covenant of Good Faith and Fair Dealing)

### (Plaintiff against AT&T Services, Inc.)

104.   Plaintiff repeats and re-alleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

105.   In April 2014, AT&T and Herring entered into the Carriage Agreement.  AT&T agreed to extend carriage for AWE (AWE had been on U-verse since 2006) and to begin carrying OAN on U-verse.  AT&T agreed to carry both channels for five years at a total monthly rate of $0.18 per subscriber per month.

106.   The implied covenant of good faith and fair dealing imposes on AT&T the duty to refrain from doing anything which would render the contract illusory by any act of its own, and also the duty to do everything that the contract presupposes

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

that each party will do to accomplish its purpose. Instead, AT&T is undermining Herring's bargained-for benefits by shifting subscribers from U-verse to DirecTV. Though this may be in AT&T's business interests, it is contrary to the purpose of the Carriage Agreement for Herring.

107. AT&T represented to Herring that it was committed to expanding U-verse and increasing its subscriber base. AT&T made these same representations to the FCC during the Acquisition approval process. As a result, Herring expected U-verse to expand after the Acquisition, just as it had done before.

108. But after acquiring DirecTV, AT&T has done the opposite. AT&T is phasing U-verse out by shifting its subscribers to DirecTV. AT&T is crippling Herring's business. Herring's compensation under the Carriage Agreement is based on the number of subscribers on U-verse. The implied covenant of good faith and fair dealing in the Carriage Agreement requires that AT&T not engage in conduct to deliberately shift customers away from U-verse and undermine its own U-verse platform.

109. Because of AT&T's misconduct, U-verse has lost subscribers every month since the Acquisition and more than 5% of its subscribers during a six-month period. Meanwhile, other MVPDs, including DirecTV, are reaping the benefits of AT&T's efforts to push subscribers away from U-verse. U-verse defectors have switched to DirecTV.

110. As a direct, foreseeable and proximate result of Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff has suffered and continues to suffer damages in excess of $100 million, or an amount to be proven at trial.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

# FIFTH CAUSE OF ACTION

## (Promissory Estoppel)

## (Plaintiff against all Defendants)

111.   Plaintiff repeats and re-alleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

112.   Multiple AT&T executives made a clear and unambiguous promise to Herring:  if Herring used its status as an owner of two independent cable television networks to lobby in support of AT&T's acquisition of DirecTV, AT&T would provide Herring's networks with carriage on DirecTV post-Acquisition.  AT&T promised that Herring would receive $20 to $25 million per year, *i.e.*, $0.12 per subscriber for 85% of DirecTV's subscribers, in licensing fees from DirecTV, including a five-year term, as with Herring's existing Carriage Agreement with AT&T.

113.   Based on the close relationship between the two companies since 2006 and Herring's potential for revenue growth, AT&T should have reasonably expected and foresaw that its promise would induce Herring to carry out its end of the bargain.

114.   Herring justifiably relied on AT&T's promise to the company's detriment.  Not only did the company expend substantial resources supporting the Acquisition, Herring also spent money and time ramping up its network content.

115.   AT&T broke its promise.  AT&T is not carrying OAN and AWE on DirecTV, as promised.

116.   Injustice can only be avoided if Herring is compensated for the injury AT&T caused.  Herring is entitled to recover all damages proximately caused by AT&T's wrongful conduct, including lost profits and other costs and expenses which Herring incurred as a result of AT&T's misconduct.  As a direct and proximate result of Defendant's breach, Plaintiff has suffered millions of dollars in

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

damages, in an amount to be proven at trial, but believed to be in excess of $100 million.

## SIXTH CAUSE OF ACTION

### (Breach of Oral Contract)

### (Plaintiff against all Defendants)

117.   Herring repeats and re-alleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

118.   Herring and AT&T entered into an oral contract with the following terms:  Herring would use its status as an owner of two independent cable television networks to lobby in support of AT&T's acquisition of DirecTV.  Upon the Acquisition's completion, AT&T promised Herring that DirecTV would carry both of Herring's networks, OAN and AWE, based on the same terms as Herring and AT&T's existing Carriage Agreement, including a customary five-year term.  Herring and AT&T agreed that Herring would receive $0.12 per month for 85% of DirecTV's subscribers, equaling $20 to $25 million per year in subscriber fees to Herring.

119.   Herring performed all its obligations in connection with this agreement or was excused from performing those obligations.

120.   AT&T breached the agreement by refusing to provide carriage for Herring's networks on DirecTV.  Herring lobbied in support of AT&T's acquisition of DirecTV.  AT&T successfully acquired DirecTV.  AT&T is not carrying OAN and AWE on DirecTV.

121.   As a direct, foreseeable and proximate result of Defendant's breach, Plaintiff has suffered millions of dollars in damages, in an amount to be proven at trial, but believed to be in excess of $100 million.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000   LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

**SEVENTH CAUSE OF ACTION**

**(Breach of Implied-in-Fact Contract)**

**(Plaintiff against all Defendants)**

122.   Herring repeats and re-alleges the allegations contained in the preceding and subsequent paragraphs of this Complaint, as though set forth fully herein.

123.   The conduct of Herring and AT&T indicates that the parties entered into an implied-in-fact contract with the following terms:  Herring would use its status as an owner of two independent cable television networks to lobby in support of AT&T's acquisition of DirecTV.  Upon the Acquisition's completion, AT&T promised Herring that DirecTV would carry both of Herring's networks, OAN and AWE.  Herring and AT&T agreed that Herring would receive $20 to $25 million per year in revenue based on licensing fees from DirecTV.

124.   Both Herring and AT&T acted intentionally.  Each party knew, or had reason to know, that the other party would interpret its conduct as an agreement to enter into a contract.

125.   Herring has performed all its obligations in connection with this agreement or was excused from performing those obligations.

126.   AT&T breached the agreement.  Herring lobbied in support of AT&T's acquisition of DirecTV.  AT&T successfully acquired DirecTV.  Now, AT&T refuses to carry OAN and AWE with the agreed upon terms.

127.   As a direct, foreseeable and proximate result of Defendant's breach, Plaintiff has suffered millions of dollars in damages, in an amount to be proven at trial, but believed to be in excess of $100 million.

WHEREFORE, Plaintiff prays for judgment against Defendants, and each of them, as follows:

1.     For economic damages, the exact amount of which will be proven at trial but, believed to be in excess of $100 million;

1      2.      For injunctive relief prohibiting Defendants from eroding AT&T U-

2 verse subscribers;

3      3.      For prejudgment interest in an amount to be proven at trial;

4      4.      For punitive/exemplary damages based on oppression and malice,

5 according to Defendants' net worth;

6      5.      For attorneys' fees and costs of suit incurred herein; and

7      6.      For such other relief that the Court deems proper.

8

9 DATED:  March 9, 2016          MILLER BARONDESS, LLP

10

11

12                              By: _____/s/ *Louis R. Miller*_____

13                                    LOUIS R. MILLER
                                      Attorneys for Plaintiff
14                                    Herring Networks, Inc.

15

16

17

18

19

20

21

22

23

24

25

26

27

28

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400  FAX: (310) 552-8400

# **DEMAND FOR JURY TRIAL**

Plaintiff demands a trial by jury pursuant to the Seventh Amendment of the United States Constitution.

DATED:  March 9, 2016          MILLER BARONDESS, LLP


By:   _/s/ Louis R. Miller_
      LOUIS R. MILLER
      Attorneys for Plaintiff
      Herring Networks, Inc.

MILLER BARONDESS, LLP
ATTORNEYS AT LAW
1999 AVENUE OF THE STARS, SUITE 1000  LOS ANGELES, CALIFORNIA 90067
TEL: (310) 552-4400   FAX: (310) 552-8400

284180.4

COMPLAINT