UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

| Present: The Honorable | CHRISTINA A. SNYDER | |
|---|---|---|
| Catherine Jeang | Not Present | N/A |
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

| Attorneys Present for Plaintiffs: | Attorneys Present for Defendants: |
|---|---|
| Not Present | Not Present |

**Proceedings:**   (IN CHAMBERS) - DEFENDANT AT&T SERVICES, INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR FAILURE TO STATE A CLAIM (Dkt. 14, filed April 25, 2016)

DEFENDANT AT&T INC.'S MOTION TO DISMISS PLAINTIFF'S COMPLAINT FOR LACK OF PERSONAL JURISDICTION (Dkt. 16, filed April 25, 2016)

## I.    INTRODUCTION

On March 9, 2016, plaintiff Herring Networks, Inc. ("Herring") intiated this action against defendants AT&T Services, Inc. ("AT&T Services") and AT&T, Inc. (collectively, "defendants").  Dkt. 1.  Plaintiff asserts claims against defendants for: (1) fraud by concealment; (2) intentional misrepresentation; (3) negligent misrepresentation; (4) breach of the implied covenant of good faith and fair dealing; (5) promissory estoppel; (6) breach of oral contract; and (7) breach of implied in fact contract.  Id.

On April 25, 2016, defendant AT&T Services filed a motion to dismiss for failure to state a claim upon which relief can be granted, Dkt. 14, and defendant AT&T, Inc. filed a motion to dismiss for lack of personal jurisdiction, Dkt. 16.[1]  On May 23, 2016, plaintiff filed oppositions to both of these motions, Dkt. 32, 33, and on June 13, 2016, defendants filed replies in support of their respective motions, Dkt. 37, 38.  Having carefully considered the parties' arguments, the Court finds and concludes as follows.

---

[1] To the extent the Court denies AT&T, Inc.'s motion to dismiss for lack of personal jurisdiction, AT&T, Inc. states that it joins AT&T Services' motion to dismiss for failure to state a claim upon which relief can be granted.  Dkt. 14, at 3 n.3.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|----------|------------------------|------|---------------|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

## II.    BACKGROUND

Plaintiff's complaint alleges the following facts:  Herring is an independent, family-owned television programming company that owns and operates two television networks—a lifestyle entertainment channel called A Wealth of Entertainment ("AWE") and a news channel called One America News Network ("OAN").  Compl. ¶¶ 16-19. Herring is a California Corporation with its principal place of business in San Diego, California.  Id. ¶ 8.  Defendants AT&T, Inc. and AT&T Services are Delaware corporations with their principal places of business in Dallas, Texas.  Id. ¶ 9.  AT&T, Inc. is the parent company of AT&T Services.  Id. ¶ 10.  Collectively, defendants are the second largest provider of mobile telephone services and the largest provider of fixed wireline telephone services in the United States.  Id. ¶ 20.  Defendants also provide broadband internet and subscription television services.  Id.  In June 2006, defendants launched AT&T U-verse ("U-verse"), a multi-channel television distribution service.  Id. ¶ 21.  From its launch, defendants included AWE as one of the channels on the U-verse platform.  Id. ¶ 23.  Several years thereafter, defendants also began including OAN on the U-verse platform.  Id. ¶ 25.

Owners of television networks, such as Herring, generate revenue through carriage (i.e. distribution) agreements with defendants.  Id.  Defendants' customers, or subscribers, would pay a fee to obtain access to a variety of networks available on the U-verse platform.  Id.  In turn, defendants would pay the network owners an agreed upon licensing fee to distribute their content.  Id.  In early 2014, Herring and defendants entered into a renewed licensing agreement (the "U-verse Agreement").  Id. ¶ 26. Pursuant to the U-verse Agreement, defendants agreed to carry both AWE and OAN for a customary five-year period with one-year renewals and to pay Herring a monthly licensing fee of $0.18 per subscriber.  Id.

According to Herring, when the parties negotiated the U-verse Agreement, defendants led Herring to believe that they were committed to expanding their U-verse platform and increasing its subscriber base.  Id. ¶ 27.  Nonetheless, Herring contends that AT&T's true intention was to wind down U-verse, acquire a competitor, DirecTV, and move subscribers from the U-verse platform to DirecTV's platform.  Id. ¶ 29.  Herring alleges that defendants deliberately withheld this information from Herring.  Id.  In particular, Herring alleges that Ryan Smith, Vice President of Content at AT&T Services,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

made the following representations to Charles Herring, the President of Herring: (1) defendants expected U-verse to challenge and surpass its competitor Time Warner Cable ("TWC")—at the time U-verse had less than half as many subscribers as TWC (approximately 5.3 million for U-verse compared to 11.4 million for TWC); (2) defendants were continuing U-verse's expansion to additional markets and capturing a larger market share in the markets where U-verse had already launched; and (3) defendants had ambitious expansion plans. Id. ¶ 28. Herring further alleges that these representations were consistent with defendants' public statements regarding their intention to grow U-verse. Id. ¶ 33. For example, in one of their Annual Reports, defendants stated:

> As part of Project Velocity IP (VIP), we [AT&T] plan to expand our IP-broadband service to approximately 57 million customer locations, including U-verse services to a total of 33 million customer locations. We expect to be substantially complete in the 2015 and 2016 timeframe.

Id. Finally, Herring alleges that defendants misrepresented their plans to grow U-verse in public filings by AT&T, Inc.'s top executives, which Herring relied on. Id. ¶¶ 90, 97.

In an early draft of the U-verse agreement, there was a clause that would have required defendants to carry Herring's networks on any subsequently-acquired platforms. Id. ¶ 31. However, towards the end of the parties' negotiations, new language was inserted into the U-verse agreement, which stated:

> For the avoidance of doubt, nothing herein shall obligate AT&T to launch and carry the Services on any System that AT&T acquires during the Term if such System is not already distributing or obligated to distribute the Services.

Dkt. 17, Smith Decl, Ex. A, "U-verse Agreement" ¶ 4.B. Herring contends that this language effectively excused AT&T from any obligation to carry Herring's networks on newly-acquired platforms, such as the DirecTV platform. Compl. ¶ 31.

A month after the U-verse Agreement was finalized, defendants announced their plans to acquire DirectTV. Id. ¶ 46. In order for defendants to acquire DirecTV they

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

needed to obtain regulatory approval from the Federal Communications Commission ("FCC"). Id. ¶ 48. According to Herring, the FCC has a Congressional mandate to foster a diverse, robust, and competitive marketplace for video programming, which includes ensuring fair and equal treatment for independent programmers. Id. ¶ 50. Thus, in order to obtain the necessary governmental approvals, defendants needed support and lobbying from independent programmers, such as Herring. Id. To this end, shortly after announcing the planned acquisition of DirecTV, executives from Herring and defendants met at AT&T Services' Los Angeles offices. Id. ¶ 55. At this meeting, Aaron Slator, the president of AT&T Services, made the following proposal: If Herring publicly supported defendants throughout its acquisition of DirecTV, including by lobbying the FCC, defendants would ensure that DirecTV carried Herring's networks on its platform. Id. ¶ 56. Slator said that the terms of carriage on DirecTV's platform would be similar to the U-verse Agreement and that this new agreement would be reduced to writing after the acquisition of DirecTV was completed. Id. ¶ 57. He also stated that the new agreement would be for a customary five year term, with automatic one-year renewals—i.e., identical to the U-verse Agreement. Id. Finally, Slator informed Herring's executives that while DirecTV would need to pay Herring less than the $0.18 per subscriber set forth in the U-verse Agreement, carriage on DirecTV's platform would still be very lucrative for Herring. Id. ¶ 59. Slator told Herring's executives that he had been authorized to make this proposal by his superiors at AT&T, Inc. Id. ¶¶ 55, 58. Herring agreed to this proposal and, thereafter, began advocating on defendants' behalf and in favor of the DirecTV acquisition. Id. ¶¶ 60, 66-69. On July 24, 2015, AT&T's acquisition of DirecTV was approved by the FCC and the AT&T/DirecTV merger was consumated. Id. ¶ 76. Nonetheless, defendants have not made either of Herring's networks available on the DirecTV platform. Id. ¶ 36.

In addition, Herring contends that, since acquiring DirecTV, defendants have aggressively solicited U-verse subscribers to move to DirecTV. Id. ¶ 35. AT&T has also publicly announced that it plans to make DirecTV its television service and wind down U-verse. Id. ¶ 37. Defendants' efforts to phase out U-verse have been successful. Since the acquisition of DirecTV, U-verse has lost approximately 325,000 subscribers, while DirecTV has gained more than 200,000 during the same time. Id. As noted above, under the U-verse Agreement, Herring's licensing fee is based on the number of U-verse subscribers. Accordingly, Herring contends that, by shifting subscribers from U-verse to DirecTV, defendants are undermining Herring's bargained-for benefit under the U-verse Agreement. Id. ¶ 36-39.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**              **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|----------|----------------------|------|---------------|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

## III.  LEGAL STANDARD

### A.  Motion to Dismiss for Lack of Personal Jurisdiction

When a defendant moves to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the plaintiff bears the burden of demonstrating that the court may properly exercise personal jurisdiction over the defendant.  Pebble Beach Co. v. Caddy, 453 F.3d 1151, 1154 (9th Cir. 2006).  Where, as here, a court decides such a motion without an evidentiary hearing, the plaintiff need only make a prima facie showing of jurisdictional facts to withstand the motion to dismiss.  Ballard v. Savage, 65 F.3d 1495, 1498 (9th Cir. 1995); Doe v. Unocal Corp., 27 F. Supp. 2d 1174, 1181 (C.D. Cal. 1998), aff'd, 248 F.3d 915 (9th Cir. 2001).  Plaintiff's version of the facts is taken as true for purposes of the motion if not directly controverted, and conflicts between the parties' affidavits must be resolved in plaintiff's favor for purposes of deciding whether a prima facie case for personal jurisdiction exists.  AT & T v. Compagnie Bruxelles Lambert, 94 F.3d 586, 588 (9th Cir. 1996); Unocal, 27 F. Supp. 2d at 1181.  If the defendant submits evidence controverting the allegations, however, the plaintiff may not rely on its pleadings, but must "come forward with facts, by affidavit or otherwise, supporting personal jurisdiction."  Scott v. Breeland, 792 F.2d 925, 927 (9th Cir.1986) (quoting Amba Mktg. Servs., Inc. v. Jobar Int'l, Inc., 551 F.2d 784, 787 (9th Cir.1977)).

Generally, personal jurisdiction exists if (1) it is permitted by the forum state's long-arm statute and (2) the "exercise of that jurisdiction does not violate federal due process."  Pebble Beach, 453 F.3d at 1154-55 (citing Fireman's Fund Ins. Co. v. Nat'l Bank of Coops., 103 F.3d 888, 893 (9th Cir. 1996).  California's long-arm jurisdictional statute is coextensive with federal due process requirements, so that the jurisdictional analysis under state and federal law are the same.  Cal. Civ. Proc. Code § 410.10; Roth v. Garcia Marquez, 942 F.2d 617, 620 (9th Cir. 1991).  The Fourteenth Amendment's Due Process Clause requires that a defendant have "minimum contacts" with the forum state so that the exercise of jurisdiction "does not offend traditional notions of fair play and substantial justice."  Int'l Shoe Co. v. Washington, 326 U.S. 310, 316 (1945).  Depending on the nature of the contacts between the defendant and the forum state, personal jurisdiction is characterized as either general or specific.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|----------|------------------------|------|---------------|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

A court has general jurisdiction over a nonresident defendant when that defendant's activities within the forum state are "substantial" or "continuous and systematic," even if the cause of action is "unrelated to the defendant's forum activities." Perkins v. Benguet Consol. Mining Co., 342 U.S. 437, 446-47 (1952); Data Disc, Inc. v. Sys. Tech. Assocs., Inc., 557 F.2d 1280, 1287 (9th Cir. 1977). The standard for establishing general jurisdiction is "fairly high" and requires that the defendant's contacts be substantial enough to approximate physical presence. Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1086 (9th Cir. 2000). "Factors to be taken into consideration are whether the defendant makes sales, solicits or engages in business in the state, serves the state's markets, designates an agent for service of process, holds a license, or is incorporated there." Id. (finding no general jurisdiction when the corporation was not registered or licensed to do business in California, paid no taxes, maintained no bank accounts, and targeted no advertising toward California).

A court may assert specific jurisdiction over a claim for relief that arises out of a defendant's forum-related activities. Rano v. Sipa Press, Inc., 987 F.2d 580, 588 (9th Cir. 1993). The test for specific personal jurisdiction has three parts:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e., it must be reasonable.

Schwarzenegger v. Fred Martin Motor Co., 374 F.3d 797, 802 (9th Cir. 2004) (citing Lake v. Lake, 817 F.2d 1416, 1421 (9th Cir. 1987)); see also Burger King Corp. v. Rudzewicz, 471 U.S. 462, 475-76 (1985). The plaintiff bears the burden of satisfying the first two prongs, and must do so to establish specific jurisdiction. Schwarzenegger, 374 F.3d at 802.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

If the plaintiff establishes the first two prongs, then it is the defendant's burden to "present a compelling case" that the third prong, reasonableness, has not been satisfied. Schwarzenegger, 374 F.3d at 802 (quoting Burger King, 471 U.S. at 477). The third prong requires the Court to balance seven factors: (1) the "extent of the defendant's purposeful injection into the forum"; (2) the burdens on defendant from litigating in the forum state; (3) the "extent of conflict with the sovereignty of the defendant's state," (4) the forum state's "interest in adjudicating the dispute"; (5) the "most efficient judicial resolution of the controversy"; (6) the "importance of the forum to the plaintiff's interest in convenient and effective relief"; and (7) the existence of an alternative forum. Ziegler v. Indian River County, 64 F.3d 470, 475 (9th Cir. 1995).

### B.     Motion to Dismiss for Failure to State a Claim

A motion pursuant to Federal Rule of Civil Procedure 12(b)(6) tests the legal sufficiency of the claims asserted in a complaint. Under this Rule, a district court properly dismisses a claim if "there is a 'lack of a cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory.' " Conservation Force v. Salazar, 646 F.3d 1240, 1242 (9th Cir. 2011) (quoting Balisteri v. Pacifica Police Dep't, 901 F.2d 696, 699 (9th Cir. 1988)). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitlement to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 555 (2007). "[F]actual allegations must be enough to raise a right to relief above the speculative level." Id.

In considering a motion pursuant to Rule 12(b)(6), a court must accept as true all material allegations in the complaint, as well as all reasonable inferences to be drawn from them. Pareto v. FDIC, 139 F.3d 696, 699 (9th Cir. 1998). The complaint must be read in the light most favorable to the nonmoving party. Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001). However, "a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Ashcroft v. Iqbal, 556 U.S. 662, 679 (2009); see Moss v. United States Secret Service, 572 F.3d 962, 969 (9th Cir. 2009) ("[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|----------|----------------------|------|---------------|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

plausibly suggestive of a claim entitling the plaintiff to relief."). Ultimately, "[d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." Iqbal, 556 U.S. at 679.

Unless a court converts a Rule 12(b)(6) motion into a motion for summary judgment, a court cannot consider material outside of the complaint (e.g., facts presented in briefs, affidavits, or discovery materials). In re American Cont'l Corp./Lincoln Sav. & Loan Sec. Litig., 102 F.3d 1524, 1537 (9th Cir. 1996), rev'd on other grounds sub nom Lexecon, Inc. v. Milberg Weiss Bershad Hynes & Lerach, 523 U.S. 26 (1998). A court may, however, consider exhibits submitted with or alleged in the complaint and matters that may be judicially noticed pursuant to Federal Rule of Evidence 201. In re Silicon Graphics Inc. Sec. Litig., 183 F.3d 970, 986 (9th Cir. 1999); see Lee v. City of Los Angeles, 250 F.3d 668, 689 (9th Cir. 2001).

As a general rule, leave to amend a complaint which has been dismissed should be freely granted. Fed. R. Civ. P. 15(a). However, leave to amend may be denied when "the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." Schreiber Distrib. Co. v. Serv-Well Furniture Co., 806 F.2d 1393, 1401 (9th Cir. 1986).

## IV.   ANALYSIS

### A.   AT&T Inc.'s Motion to Dismiss for Lack of Personal Jurisdiction

Plaintiff has named two defendants in this action—AT&T Services and its parent company, AT&T, Inc. AT&T, Inc. moves to dismiss for lack of personal jurisdiction. In brief, AT&T, Inc. contends that it has not engaged in any of the conduct underlying the claims raised in plaintiff's complaint. Rather, AT&T, Inc. contends that those activities were performed by its subsidiary AT&T Services. Accordingly, AT&T, Inc. argues that it lacks the requisite "minimum contacts" to subject it to this Court's jurisdiction.

As noted above, there are two types of personal jurisdiction—general and specific. However, as an initial matter, plaintiff concedes that general personal jurisdiction is not appropriate over AT&T, Inc. in California. See Opp'n., at 9 n.3 ("Herring has never asserted general jurisdiction as a basis for jurisdiction"). Accordingly, the Court only

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

addresses whether specific personal jurisdiction is appropriate over AT&T, Inc. in California.

### 1.    Specific Jurisdiction

A court may assert specific jurisdiction over a claim for relief that arises out of a defendant's forum-related activities. <u>Rano</u>, 987 F.2d at 588. As noted above, the Ninth Circuit uses the following three-part test to determine whether specific jurisdiction may be exercised over a particular defendant:

> (1) The non-resident defendant must purposefully direct his activities or consummate some transaction with the forum or resident thereof; or perform some act by which he purposefully avails himself of the privilege of conducting activities in the forum, thereby invoking the benefits and protections of its laws;

> (2) the claim must be one which arises out of or relates to the defendant's forum-related activities; and

> (3) the exercise of jurisdiction must comport with fair play and substantial justice, i.e. it must be reasonable.

<u>Schwarzenegger v. Fred Martin Motor Co.</u>, 374 F.3d at 802.

The first prong of this test is, in turn, separated into two distinct concepts: "purposeful direction" and "purposeful availment." The "purposeful availment analysis is most often used in suits sounding in contract," where as the "purposeful direction analysis . . . is most often used in suits sounding in tort." <u>Id.</u> Here, plaintiff's claims against AT&T, Inc. sound in both contract and tort (i.e., fraud). Accordingly, both the purposeful direction and purposeful availment tests are applicable and the Court addresses each in turn.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

### a.    Whether AT&T Purposefully Directed its Activities Towards California

In a purposeful direction analysis, courts apply the "effects" test first set forth by the Supreme Court in Calder v. Jones, 465 U.S. 783 (1984). See Mavrix Photo, 647 F.3d at 1228 (9th Cir. 2011) ("In tort cases, we typically inquire whether a defendant 'purposefully direct[s] his activities' at the forum state, applying an 'effects' test").  This test requires that "the defendant allegedly must have (1) committed an intentional act, (2) expressly aimed at the forum state, (3) causing harm that the defendant knows is likely to be suffered in the forum state."  Brayton Purcell, 606 F.3d at 1128.

Here, the Court finds that plaintiff has identified at least one intentional act committed by AT&T, Inc.  Specifically, plaintiff alleges that AT&T, Inc.'s CEO and Chairman, Randall Stephenson ("Stephenson"), expressly authorized the President of AT&T Services, Aaron Slator ("Slator"), to promise plaintiff that if it publicly supported AT&T, Inc.'s acquisition of DirecTV, plaintiff's networks would be carried on DirecTV's platform.  Plaintiff also alleges that this promise was reitterated several months later by another AT&T Services executive, James Cicconi ("Cicconi") and that Cicconi stated that his superiors at AT&T, Inc. authorized him to make this promise.[2] And plaintiff alleges Cicconi reported directly to Stephenson and was responsible for leading AT&T, Inc.'s efforts to gain government approval for the DirecTV acquisition. Compl. ¶ 71.  In this capacity, Cicconi allegedly directed Herring's activities to promote the DirecTV acquisition, which included, among other things, lobbying the FCC, the Department of Justice, and members of Congress, filing briefs with the FCC, and

---

[2] AT&T, Inc. argues that Cicconi's statements do not support jurisdiction in California because he met with plaintiff in Washington, D.C., not California.  This argument misses the mark.  For jurisdictional purposes, physical presence in the forum is not required.  See Burger King, 471 U.S. at 476 ("So long as a commercial actor's efforts are 'purposefully directed' toward residents of another State, we have consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.")

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

soliciting other independent programmers to support AT&T, Inc.'s acquisition of DirecTV.  Compl. ¶¶ 66, 68, 74.[3]

These allegations are uncontroverted by the affidavits submitted by AT&T, Inc. Instead, AT&T, Inc. contends that these intentional acts cannot support personal jurisdiction over AT&T, Inc. because they were committed by employees of AT&T *Services*.  AT&T, Inc. also cites several cases in which courts have held that, as a general matter, parent companies, such as AT&T, Inc., may not be subject to personal jurisdiction based on the contacts of their subsidiaries.  See, e.g., Sonora Diamond Corp. v. Superior Court, 83 Cal. App. 4th 523, 540 (Cal. Ct. App. 2000) ("We start with the firm proposition that neither ownership nor control of a subsidiary corporation by a foreign

---

[3] Plaintiff identifies a number of other purported intentional acts committed by AT&T, Inc.  Specifically, plaintiff alleges: (1) AT&T, Inc. "set company-wide corporate policies and practices" for its subsidiaries, including AT&T Services; (2) AT&T, Inc.'s CEO and Chairman of the Board, Randall Stephenson, made false statements to the public regarding AT&T's intent to expand U-verse; (3) AT&T, Inc. "planned, orchestrated and ultimately consummated" the acquisition of DirecTV; and (4) AT&T, Inc. expressed an interest in acquiring a stake in plaintiff.  Nonetheless, the Court finds that these acts do not support the exercise of specific personal jurisdiction over AT&T, Inc.  With respect to the allegations that AT&T, Inc. set corporate policies for its subsidiaries, that its CEO and Chairman made false statements to the public, and that AT&T, Inc. planned the acquisition of DirecTV, plaintiff cannot establish that these acts were "expressly aimed" at California, let alone plaintiff.  Indeed, it does not appear that these acts were directed at *any* state in particular.  See also James M. Wagstaffe, Federal Civil Procedure Before Trial Ch. 3, Personal Jurisdiction (The Rutter Group 2016) ¶ 3:172.5 ("[T]he 'expressly aimed' requirement distinguishes cases where plaintiff fortuitously lives in the forum state with the conduct directed, e.g., to the nation as a whole, from those in which the intentional conduct is directed uniquely to the forum itself.") (citing Clemens v. McNamee, 615 F.3d 374, 380 (5th Cir. 2010) (defamatory statements made in New York to national publication about a Texas resident insufficient)).  And, as for AT&T, Inc.'s purported interest in acquiring a stake in plaintiff, while arguably directed towards California, this act is unrelated to plaintiff's claims in this action—i.e., plaintiff's claims do not "arise out of" this alleged contact with California.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|----------|----------------------|------|---------------|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

parent corporation, without more, subjects the parent to the jurisdiction of the state where the subsidiary does business."). Nonetheless, a parent company may still be subject to jurisdiction based on its own contacts with a forum state. And, to the extent AT&T, Inc. directed and/or authorized AT&T Services to engage in conduct in California, those actions may be attributed to AT&T, Inc. for purposes of evaluating personal jurisdiction. See also Weaver v. Johnson & Johnson, Ethicon, Inc., 2016 WL 1668749, at *5 (S.D. Cal. Apr. 27, 2016) (Curiel, J.) ("A parent corporation may be amenable to specific jurisdiction in a forum state, through an agency relationship, if it itself targeted the forum or it 'purposefully availed itself of a forum by directing its agents or distributors to take action there.' ") (quoting Daimler AG v. Bauman, 134 S. Ct. 746, 759 n.13 (2014)); HealthMarkets, Inc. v. Superior Court, 171 Cal. App. th 1160, 1170 (Cal. Ct. App. 2009) (Croskey, J.) (noting that jurisdiction may be appropriate over a defendant-parent company where a "defendant has purposefully directed its activities at the forum state by causing a separate person or entity to engage in forum contacts."). Here, plaintiff alleges that executives at AT&T, Inc., including the Chairman and CEO of AT&T, Inc., authorized and instructed both Slator and Cicconi to promise plaintiff that its networks would be carried on DirecTV's platform. Moreover, plaintiff alleges that it supported the acquisition of DirecTV on AT&T, Inc.'s behalf and at the direction of Cicconi, who reported directly to Stephenson. Accordingly, the Court finds that these intentional acts may fairly be attributed to AT&T, Inc.[4]

---

[4] Additionally, under principles of California agency law, Slator and Cicconi's conduct can be attributed to AT&T, Inc. under the theory that they acted with actual—or at least apparent—authority from AT&T, Inc. Plaintiff alleges that Slator and Cicconi had express instructions from AT&T, Inc. to promise plaintiff that its networks would be carried on DirecTV's platform. Moreover, plaintiff alleges that Slator and Cicconi categorically represented to plaintiff that they were acting on behalf of their superiors at AT&T, Inc. Under California law, when an agent acts under actual or ostensible (i.e., apparent) authority, the principal is bound by the agent's actions. Cal. Civ. Code §§ 2330, 2334. Moreover, an agency relationship may be created by either "precedent authorization or a subsequent ratification." Cal. Civ. Code § 2307. Here, accepting plaintiff's uncontroverted allegations as true, AT&T, Inc. conferred actual authority upon Slator and Cicconi to promise plaintiff that its networks would be carried on DirecTV's platform. See also Penthouse Int'l, Ltd. v. Barnes, 792 F.2d 943, 947-48 (9th Cir. 1986) (photographer acted within actual implied authority per Penthouse magazine's

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

Next, the Court finds that AT&T, Inc.'s conduct was expressly aimed at California. Plaintiff alleges that AT&T, Inc. authorized and instructed Slator and Cicconi to make promises to plaintiff—a California corporation. AT&T, Inc. argues that, under recent Supreme Court and Ninth Circuit precedent, the mere fact that a resident of a forum has been injured is insufficient to invoke personal jurisdiction. See, e.g., Walden v. Fiore, 134 S.Ct. 1115, 1125 (2014) ("mere injury to a forum resident is not a sufficient connection to the forum"). However, in those cases the defendant had only attenuated contacts with the forum state, and the courts held that the fact that the plaintiff happened to be from the forum state was insufficient to support the assertion of personal jurisdiction. For example, in Walden v. Fiore, two Nevada residents sued a DEA agent in a Nevada court based on a search the agent had conducted in Georgia. 134 S.Ct. at 1119. The Supreme Court held that the Nevada court lacked jurisdiction over the agent reasoning that "the plaintiff cannot be the only link between the defendant and the forum." Id. at 1122. Similarly, in Picot v. Weston, 780 F.3d 1206, 1214 (9th Cir. 2015), a California resident brought suit against a Michigan resident for making various threats to stop a business transaction. The Michigan resident had engaged in no conduct in California and the underlying business transaction had been negotiated in Michigan and was expected to be performed in Michigan. Id. at 1212. Accordingly, relying on

---

instructions to present contracts to models); In re Nelson, 761 F.2d 1320, 1322 (9th Cir. 1985) (husband had actual implied authority to encumber wife's interest in property where wife knew he signed her name to loan documents and husband reasonably believed he had authority to do so). Furthermore, it is appropriate for the Court to consider California agency law in evaluating personal jurisdiction. See James M. Wagstaffe, Federal Civil Procedure Before Trial Ch. 3, Personal Jurisdiction (The Rutter Group 2016) ¶ 3:83.3 ("Whether the person whose forum-related acts give rise to jurisdiction was acting as an agent of the nonresident defendant, or as an independent contractor, is determined in accordance with applicable state law.") (citing Ochoa v. J.B. Martin and Sons Farms, Inc., 287 F.3d 1182, 1189 (9th Cir. 2002) (looking to Arizona law to determine whether personal jurisdiction existed based on contacts of purported agent); Vázquez-Robles v. CommoLoCo, Inc.,757 F.3d. 1, 3 (1st Cir. 2014) (same applying Puerto Rican law)); Cf. Daimler, 134 S.Ct. 746, 759 n.13 (2014) ("Agency relationships, we have recognized, may be relevant to the existence of specific jurisdiction . . . As such, a corporation can purposefully avail itself of a forum by directing its agents or distributors to take action there.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES - GENERAL          'O'

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|----------|------------------------|------|----------------|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

Walden, the Ninth Circuit held that the defendant's out-of-state actions "did not connect him with California in a way sufficient to support the assertion of personal jurisdiction over him." Id. at 1215.

By contrast, in this case, plaintiff has not merely alleged that jurisdiction is appropriate because it is a resident of California who suffered harm. Rather, plaintiff alleges that AT&T, Inc. authorized Slator and Cicconi to make promises to plaintiff which envisioned an ongoing business relationship whereby plaintiff's networks would be carried on DirecTV's platform for a term of five years. See also Walden, 134 S.Ct. at 1125 ("[W]e have upheld the assertion of jurisdiction over defendants who have purposefully 'reach[ed] out beyond' their State and into another by, for example, entering a contractual relationship that 'envisioned continuing and wide-reaching contacts' in the forum State.") (citing Burger King, 471 U.S. at 479–480). And plaintiff alleges that Slator made this promise in the Los Angeles offices of AT&T Services—i.e., in California. Accordingly, the Court finds that Walden and Picot are distinguishable and that AT&T, Inc.'s conduct was expressly aimed at California.

Finally, the Court finds that plaintiff has adequately alleged that AT&T, Inc. knew plaintiff would suffer harm in California. AT&T, Inc. contends that plaintiff has failed to adequately allege that AT&T, Inc. knew its intentional acts would cause harm in California. But, at all times relevant to this action, plaintiff has been a California corporation doing business in San Diego, California. Moreover, AT&T, Inc.'s subsidiary, AT&T Services, had a contractual relationship with plaintiff spanning nearly ten years, and throughout that relationship plaintiff was a California corporation. Lastly, AT&T, Inc. authorized Slator to make promises to plaintiff, and Slator made those promises in California. See also Dole Food Co., Inc. v. Watts, 303 F.3d 1104, 1114 (9th Cir. 2002) (finding effects test satisfied where "[t]he principal place of business of [plaintiff was] California, and [plaintiff's] managers in California were induced to approve the injurious transactions."). In light of these allegations, the Court finds that plaintiff has adequately established that AT&T, Inc. was aware that any harm resulting from its conduct would be felt in California.

Accordingly, all three elements of the "effects" test are satisfied and the Court finds that AT&T, Inc. purposefully directed its conduct towards California.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|----------|------------------------|------|----------------|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

### b.     Whether AT&T Purposefully Availed Itself of California

The Court also finds that AT&T, Inc. has purposefully availed itself of California. . " 'Purposeful availment' requires that the defendant 'have performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state.' " Sher v. Johnson, 911 F.2d 1357, 1362 (9th Cir. 1990) (quoting Sinatra v. Nat'l Enquirer, Inc., 854 F.2d 1191, 1195 (9th Cir. 1988)).  Here, AT&T, Inc. instructed Slator and Cicconi to solicit a California corporation to engage in lobbying efforts on its behalf.  In exchange for those lobbying efforts, AT&T, Inc. authorized Slator and Cicconi to promise plaintiff an ongoing contractual relationship whereby plaintiff's television networks would be carried on DirecTV's platform.  By this conduct, AT&T, Inc. purposefully availed itself of the privilege of conducting business in California.  See also Burger King, 471 U.S. at 475-76 ("where the defendant 'deliberately' has engaged in significant activities within a State or has created *'continuing obligations' between himself and residents of the forum* he manifestly has availed himself of the privilege of conducting business there . . .") (emphasis added) (citations omitted); Peterson v. Highland Music, Inc., 140 F.3d 1313, 1320 (9th Cir. 1998) (negotiating a contract in California with a California resident satisfies "purposeful availment").

Again, AT&T, Inc.'s affidavits do not controvert these allegations.  Instead, AT&T, Inc. contends that neither Slator nor Cicconi is an employee of AT&T, Inc.  However, as already stated, because AT&T, Inc. purportedly instructed and authorized Slator and Cicconi to make promises to plaintiff, their conduct can be imputed to AT&T, Inc.

### c.     Whether Plaintiff's Claims "Arise Out of or Relate" to AT&T, Inc.'s Forum-Related Contacts

Under the second prong of the specific personal jurisdiction analysis, the Court must assess whether plaintiff's claims arise out of or relate to AT&T, Inc.'s forum-related contacts.  "[A] lawsuit arises out of a defendant's contacts with the forum state if a direct nexus exists between those contacts and the cause of action." In re Western States Wholesale Nat. Gas Antitrust Litig., 715 F.3d 716, 742 (9th Cir. 2013) (citations omitted).

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

Here, as explained above, AT&T, Inc.'s contacts with California consist of authorizing and instructing Slator and Cicconi to promise plaintiff that, if plaintiff publicly supported AT&T, Inc.'s acquisition of DirecTV, defendants would carry plaintiff's networks on DirecTV's platform. In the complaint, plaintiff has asserted several claims against AT&T, Inc. directly predicated on this promise. See also Dole, 303 F.3d at 1114 (claims arose out of forum-related contacts where contacts were an "integral and essential part[]" of the allegations underlying plaintiff's claims). Accordingly, plaintiff's claims against AT&T, Inc. "arise out of or relate to" AT&T, Inc.'s forum-related contacts.

### d.   Whether it Would be Unreasonable to Subject AT&T, Inc. to Personal Jurisdiction in California

Finally, the Court must assess whether it would be reasonable to subject AT&T, Inc. to personal jurisdiction in California. The burden is on defendant to present a "compelling case that the exercise of jurisdiction would not be reasonable." Menken v. Emm, 503 F.3d. 1050, 1057 (9th Cir. 2007). In evaluating whether the exercise of personal jurisdiction is reasonable, courts consider the following factors: "(1) the extent of the defendant's purposeful interjection into the forum state, (2) the burden on the defendant in defending in the forum, (3) the extent of the conflict with the sovereignty of the defendant's state, (4) the forum state's interest in adjudicating the dispute, (5) the most efficient judicial resolution of the controversy, (6) the importance of the forum to the plaintiff's interest in convenient and effective relief, and (7) the existence of an alternative forum." In re Western States, 715 F.3d at 745 (citing Bancroft & Masters, Inc. v. Augusta Nat'l Inc., 223 F.3d 1082, 1088 (9th Cir.2000)) . Here, the Court finds that the majority of these factors weigh in favor of exercising personal jurisdiction over AT&T, Inc.

First, as discussed above, plaintiff has alleged that Slator and Cicconi promised plaintiff that, if it publicly supported AT&T, Inc.'s acquisition of DirecTV, defendant would carry plaintiff's networks on DirecTV's platform. Moreover, plaintiff alleges that at least one of these promises was made in California. AT&T, Inc. argues that "it is not reasonable to hale AT&T, Inc. into a California court based on the contacts of individuals employed by other AT&T entities"—i.e., Slator and Cicconi. Mot., at 13. But, plaintiff has alleged that AT&T, Inc.'s officers and directors instructed and ratified Slator and Cicconi's promises to plaintiff that form the basis for this lawsuit. In light of these

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**           **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

contacts, the Court finds that the "purposeful interjection" factor weighs in favor of exercising jurisdiction.  See Panavision Intern., L.P. v. Toeppen, 141 F.3d 1316, 1323 (9th Cir. 1998) (finding "purposeful interjection" factor weighed "strongly in favor of the district court's exercise of personal jurisdiction" where the defendant knew its conduct would harm plaintiff in California and sent a letter to plaintiff in California.).

Regarding the next two factors, AT&T, Inc. does not explain how it will be burdened by litigating this case in California, nor does it identify any relevant conflict between the laws of California and Delaware and Texas, where AT&T, Inc. is incorporated and headquartered, respectively.  Accordingly, these factors weigh in favor of exercising jurisdiction.

California also has an interest in adjudicating this action, which concerns a California corporation and where at least some of the relevant conduct occurred in California.  See also Burger King, 471 U.S. at 474 ("A State generally has a 'manifest interest' in providing its residents with a convenient forum for redressing injuries inflicted by out-of-state actors.").  In addition, given that plaintiff is headquartered in California and particularly given that defendants concede that jurisdiction is appropriate in California over AT&T Services, it is arguably most efficient to resolve plaintiff's claims against AT&T, Inc. in this forum as well. Thus, these two factors also weigh in favor of exercising jurisdiction.

Finally, AT&T, Inc. correctly notes that plaintiff could conceivably pursue its claims against AT&T, Inc. in either Delaware or Texas—the jurisdictions where AT&T, Inc. is incorporated and headquartered.  Accordingly, this factor weighs against the exercise of jurisdiction.  Nonetheless, given that all of the other factors courts consider weigh in favor of exercising jurisdiction, the Court finds that it is not unreasonable to subject AT&T, Inc. to personal jurisdiction in California.

Thus, plaintiff has satisfied all three prongs of the Ninth Circuit's personal jurisdiction test.  The Court, therefore, DENIES AT&T, Inc.'s motion to dismiss for lack of personal jurisdiction.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| CIVIL MINUTES - GENERAL | | | 'O' |
|---|---|---|---|
| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

**B.    AT&T Service's Motion to Dismiss for Failure to State a Claim**

In the complaint, plaintiff asserts seven claims for relief against defendants: (1) fraud by concealment; (2) intentional misrepresentation; (3) negligent misrepresentation; (4) breach of the implied covenant of good faith and fair dealing; (5) promissory estoppel; (6) breach of oral contract; and (7) breach of implied in fact contract.  These claims roughly divide into three legal theories.  First, plaintiff contends that defendants fraudulently represented that they intended to grow their U-verse platform when, in reality, they intended to wind-down the platform.  Second, plaintiff contends that AT&T Services breached the covenant of good faith and fair dealing implicit in the U-verse Agreement by deliberately shifting customers away from the U-verse platform.  And third, plaintiff alleges that defendants entered into an oral agreement—which they subsequently breached—to place plaintiff's network on DirecTV in exchange for plaintiff's assistance lobbying the government to approve AT&T's acquisition of DirecTV.  Defendants contend that none of these theories states a viable basis for relief. For the following reasons the Court disagrees.

**1.    Plaintiff's Fraud Claims**

Plaintiff asserts claims for fraud by concealment (claim one), intentional misrepresentation (claim two), and negligent misrepresentation (claim three).  In each of these claims, plaintiff alleges that defendants intentionally or negligently misrepresented that they were committed to and intended to grow their U-verse platform.  Nonetheless, plaintiff alleges that defendants true intention was to acquire DirecTV, wind down the U-verse platform, and transition customers to DirecTV's platform.  Plaintiff alleges that, in reliance on defendants' allegedly false representation that it intended to grow the U-verse platform, it entered into the U-verse Agreement.  Defendants now move to dismiss each of plaintiff's fraud claims.  Because these claims raise similar issues the Court addresses them together.

Defendants' first argue that plaintiff has failed to allege actionable misrepresentations of fact.  "It is hornbook law that an actionable misrepresentation must be made about past or existing *facts*."  Samica Enters., LLC v. Mail Boxes Etc., USA, Inc., 637 F. Supp. 2d 712, 726 (C.D. Cal. 2008) (emphasis added).  As such, statements and predictions about future events are generally considered to be mere opinions that are not actionable.  See In re West Seal, Inc. Sec. Litig., 518 F. Supp. 2d 1148, 1168 (C.D.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**            **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|----------|------------------------|------|---------------|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

Cal. 2007) ("Predictions and forecasts which are not of the type subject to objective verification are rarely actionable."). Nonetheless, misrepresentations about future events are actionable "if they were intended and accepted as a representations of fact and involved matters peculiarly within the speaker's knowledge." Eade v. Reich, 120 Cal. App. 32, 35 (1932).

Here, plaintiff alleges that defendants represented, among other things: (1) that they intended to expand U-verse to additional markets and capture a larger market share in existing markets; (2) that they intended to exceed the market share of their competitor, TWC; and (3) that they had "ambitious expansion plans" for U-verse. Defendants argue that these statements constitute mere opinions or puffery about U-verse's potential for future growth. Defendants also cite several cases finding that similar statements constituted mere statements of opinion that were not actionable. See, e.g., In re Energy Recovery Inc. Sec. Litig., 2016 WL 324150, at *19 (N.D. Cal. Jan. 27, 2016) (statement such as "projecting excellent results," "blowout winner product," and "significant sales gains" are not actionable); In re Wet Seal, 518 F. Supp. 2d at 1168 (statements such as "growth that positions us beautifully," "measurable progress," "continuing improvements," "a sizable lead over our competition," and "resilience in the face of mounting debt" are not actionable). However, plaintiff does not merely contend that it relied on defendants predictions about U-verse's potential growth. Rather, implicit in each of these statements was a representation that defendants were, at a minimum, committed to their U-verse platform and intended to take steps to grow U-verse's market share. Indeed it is unclear how defendants could have expected to exceed their competitor TWC's market share, a feat that would have apparently required more than doubling U-verse's subscriber base, if they did not have at least some intention of growing the U-verse platform. In short, while defendants predictions regarding the potential growth of U-verse may not be actionable, to the extent those statements indicated a commitment to growing the U-verse platform and taking steps to expand U-verse's market share, they may form the basis of an actionable fraud claim. See also Jolley v. Chase Home Fin., LLC, 213 Cal. App. 4th 872, 892 (Cal. Ct. App. 2013) ("well recognized is that there may be liability for an opinion where it is expressed in a manner implying a factual basis which does not exist.") (citations omitted); Brakke v. Economic Concepts, Inc., 213 Cal. App. th 761, 769 (Cal. Ct. App. 2013) (statements of opinion may be actionable "where a party states his opinion as an existing fact or as implying facts which justify a belief in the truth of the opinion.").

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

Second, defendants argue that plaintiff's have failed to plausibly plead reliance. Specifically, they contend that the U-verse Agreement contained several provisions expressly stating that defendants might acquire a new television distribution platform upon which plaintiff would have no right to air its programming.  Defendants point to the Acquired Systems Clause, paragraph 4.B. of the U-verse Agreement, which states that defendants might acquire a new platform and that defendants would have no obligation to carry plaintiff's networks on such a platform:

> For the avoidance of doubt, nothing herein shall obligate AT&T to launch and carry the Services on any System that AT&T acquires during the Term if such System is not already distributing or obligated to distribute the Services.

Smith Decl, Ex. A, "U-verse Agreement" ¶ 4.B.  And defendants point to paragraph 3.C. of the U-verse Agreement in which defendants reserved the right to shut down U-verse in whole or in part at any point in the future:

> Upon sixty (60)-days advance written notice to Network, AT&T may terminate this Agreement in full if AT&T ceases operation of the System(s) as a whole, or if AT&T discontinues its delivery of video programming in any geographic area(s) being served by the System(s), then AT&T can terminate this Agreement as to such geographic area(s)

Id. ¶ 3.C.  However, regardless of what the U-verse Agreement states regarding defendants obligations to carry plaintiff's network on later-acquired platforms or their ability to terminate the U-verse Agreement, plaintiff still could have relied upon defendants' representation that they were committed to and intended to grow the U-verse platform.  Indeed, plaintiff contends that it agreed to sign an agreement containing disclaimers regarding later-acquired platforms *because* of defendants representation that they intended to grow the U-verse platform.  See, e.g., Compl. ¶ 91 (AT&T made these fraudulent statements with the intent to induce Herring to sign the [U-verse] Agreement with language that excused AT&T from any obligation to carry Herring's networks on [a platform] that AT&T acquires, such as DirecTV.").  Moreover, given that under the U-verse Agreement plaintiff's licensing fees were directly tied to U-verse's subscriber base, it is at least plausible that plaintiff would have relied on defendants' statements that they

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**   **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|----------|------------------------|------|----------------|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

intended to grow U-verse's market share (i.e., the number of U-verse subscribers). Lastly, the Court notes that reliance is generally considered to be a question of fact rarely amenable to resolution at the pleadings stage. See Alliance Mortg. Co. v. Rothwell, 10 Cal. th 1226, 1239 (1995) ("Except in the rare case where the undisputed facts leave no room for a reasonable difference of opinion, the question of whether a plaintiff's reliance is reasonable is a question of fact.") (citations omitted).

Third, defendants contend that plaintiff has failed to plead with requisite particularity that defendants alleged statements were false when made.  To plead a claim for fraud, a plaintiff "must allege facts sufficient to plausibly establish that the statement was false when made." Muse Brands, LLC v. Gentil, 2015 U.S. Dist. LEXIS 99143, *13 (N.D. Cal. July 28, 2015).  Here, defendants argue that plaintiff has failed to plausibly allege that when defendants made their purportedly false statements regarding the future of U-verse in 2014, they knew or should have known that they intended to wind down U-verse's business and transition U-verse subscribers to DirecTV's platform.  Defendants note that the acquisition of DirecTV was uncertain and required government approval—a process that ultimately lasted more than one year.  And defendants contend that there is an obvious alternative explanation for defendants' alleged misrepresentation; namely, that defendants "intended to do precisely what [they] said with respect to U-verse in early 2014, but changed [their] minds over a year later once the DirecTV acquisition became a reality."  Mot., at 14.

Nonetheless, the Court finds that plaintiff has adequately alleged falsity.  Plaintiff alleges that in early 2014 and up and until plaintiff signed the U-verse Agreement with AT&T Services, defendants continued to represent that they intended to grow the U-verse platform.  Nonetheless, in May 2014, only a month after plaintiff signed the U-verse Agreement, defendants announced their plan to acquire DirecTV for $65 billion.  As both parties acknowledge, this was a massive undertaking, involving extensive lobbying efforts by defendants as well as numerous third parties.  It is simply implausible that this planned acquisition first arose in the weeks after the U-verse Agreement was finalized. Rather, based on the allegations in the complaint, it seems far more plausible that, throughout the period in which the parties were negotiating the U-verse Agreement, during which time defendants continued to represent that they planned to grow the U-verse platform, defendants were preparing for and planning to acquire DirecTV. Moreover, given the magnitude of the DirecTV acquisition and the considerable efforts purportedly required to make the acquisition a reality, it also seems plausible that

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|----------|----------------------|------|---------------|

| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. |
|-------|-------------------------------------------------------|

defendants could have formulated a plan to wind down their U-verse platform in order to take advantage of DirecTV's existing platform in advance of announcing the planned acquisition of DirecTV.

With respect to defendants' "obvious alternative explanation," defendants contend that plaintiff has failed to plead facts tending to exclude this explanation. However, plaintiff has alleged that defendants engaged in conduct that was arguably inconsistent with their "alternative explanation." Specifically, plaintiff's allegation that defendants took steps to acquire an alternative television distribution platform (DirecTV) is arguably inconsistent with defendants' contemporaneous statements that they intended to grow their existing platform (U-verse). Indeed, even defendants concede that acquisition of an alternative platform could detrimentally affect their U-verse platform. Reply, at 10 ("It goes without saying that, if AT&T acquired an alternative platform, the acquisition could impede U-verse."). Thus, by alleging facts that are arguably inconsistent with defendants "alternative explanation," the Court finds that plaintiff's have adequately addressed this claimed alternative explanation for purposes of a motion to dismiss. See also Muse Brands, LLC v. Gentil, 2015 WL 4572975, at *4 (N.D. Cal. Jul 29, 2015) ("[T]o plead falseness, the plaintiff must provide an explanation as to why the disputed statement was untrue or misleading when made[,] which may be done by pointing to inconsistent contemporaneous statements or information . . .") (citation omitted). Lastly, as with reliance, the Court finds that falsity is an issue better decided either on a motion for summary judgment or by the trier of fact at trial. See also Starr v. Baca, 652 F.3d 1202, 1216 (9th Cir. 2011) (where there are "two alternative explanations, one advanced by defendant and the other advanced by plaintiff, both of which are plausible, plaintiff's complaint survives a motion to dismiss under rule 12(b)(6).").

Fourth, defendants allege that plaintiff has failed to adequately allege that it suffered any harm as a result of defendants' purportedly false statements. Defendants argue that, at most, plaintiff has alleged that, had it known defendant's' true intentions regarding the U-verse platform, it would not have entered into the U-verse Agreement in the first place or, at a minimum, would have insisted on an agreement with better terms, such as an obligation to place plaintiff's networks on later-acquired platforms. Defendants' argue that, had plaintiff not entered into the U-verse agreement at all, it would have been in a worse position than it is purportedly in now—having lost out on the subscriber fees that were generated by the U-verse Agreement. And defendants argue that the potential that plaintiff would have been able to negotiate a different agreement

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
| --- | --- | --- | --- |
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

with better terms is pure speculation that cannot support a claim for damages. However, the issue of what profits plaintiff may have foregone or what losses it may have avoided by not agreeing to the U-verse Agreement is again a question of fact to be decided at a later stage in this litigation. See also Qwest Commc'n v. Herakles, LLC, 2008 WL 3864826, at*6 (E.D. Cal. Aug. 19, 2008) (finding allegations of harm and damages to be proven at trial were sufficient to survive a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6)). And the Court cannot find that it is implausible that had plaintiff known about defendants' intentions regarding U-verse it would not have been able to negotiate an agreement with different or more favorable terms. Indeed it seems unlikely that, had plaintiff known that defendants intended to wind down their U-verse platform, it would have agreed to an agreement that excused defendants from any obligation to carry plaintiff's networks on later-acquired platforms. Moreover, defendants fail to acknowledge all of the purported harms identified in the complaint. For example, plaintiff alleges that, in reliance on defendants' representations, it expended substantial resources strengthening its program offerings on OAN and AWE. Thus, the Court finds that plaintiff has adequately alleged harm.

Finally, defendants argue that plaintiff's fraud claims are barred by the economic loss rule. Specifically, defendants argue that plaintiff's fraud claims are based on the same conduct underlying their claim for breach of the implied covenant of good faith and fair dealing and thus impermissibly conflate a claim for fraud with a claim for breach of contract. In short, the economic loss rule states "that no tort cause of action will lie where the breach of duty is nothing more than a violation of a promise which undermines the expectations of the parties to an agreement." Oracle USA, Inc. v. XL Global Services, Inc., 2009 WL 2084154, at *4 (N.D. Cal. July 13, 2009); see also JMP Securities LLP v. Altair Nanotechnologies, Inc., 880 F. Supp. 2d 1029, 1042 (N.D. Cal. Jul. 23, 2012) ("This rule serves to prevent every breach of a contract from giving rise to tort liability and the threat of punitive damages").

However, the economic loss rule does not apply where, as here, the defendants' tortious conduct is separate and apart from the alleged breach of contract. Here, plaintiff has asserted distinct claims for fraud and for breach of the implied covenant of good faith and fair dealing. In the fraud claims, plaintiff alleges that defendants falsely represented that they intended to grow the U-verse platform. In reliance on these representations, plaintiff contends that it agreed to enter into the U-verse Agreement and took efforts to expand its existing networks. By contrast, in plaintiff's implied covenant claim, it alleges

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

that, *after* agreeing to the U-verse Agreement, defendants breached that agreement by failing to make a good faith effort to grow their U-verse platform and, in fact, taking steps to shrink the platform. Thus plaintiff's fraud claims are based on separate and distinct conduct from their breach of contract claims and the economic loss rule does not apply. See also Silver v. Goldman Sachs Grp., Inc., 2011 WL 1979241, at *5 (C.D. Cal. May 19, 2011) ("a plaintiff can separately allege a claim for negligent misrepresentation stemming from a contract, as courts have held that the claim for negligent misrepresentation is a traditional common law tort claim, and that by alleging this tort, a plaintiff allege[s][a] violation [ ] of duties independent of the contract.") (citations omitted); Rejects Skate Magazine, Inc. v. Acutrack, Inc., 2006 WL 2458759, at*5 (N.D. Cal. Aug. 22, 2006) (finding that claims for neligent and intentional misrepresentation alleged "violations of duties independent of the contract" and therefore the economic loss rule did not apply).

Accordingly, the Court finds that plaintiff's fraud claims are sufficiently alleged in the complaint and, therefore, DENIES defendants' motion to dismiss these claims.

### 2.      Plaintiff's Claim for Breach of the Implied Covenant of Good Faith and Fair Dealing

Plaintiff asserts a claim, solely against AT&T Services, for breach of the implied covenant of good faith and fair dealing. In this claim, plaintiff alleges that AT&T Services breached the covenant of good faith and fair dealing implied in the U-verse Agreement by engaging in conduct to deliberately shift customers away from the U-verse platform thereby undermining its own U-verse platform.

"Every contract imposes upon each party a duty of good faith and fair dealing in its performance and its enforcement." Carma Developers (Cal.), Inc. v. Marathon Dev. Cal., Inc., 2 Cal. 4th 342, 371-72 (1992). The implied covenant imposes on contracting parties the duty to refrain from unfair dealing, whether or not it also constitutes breach of a consensual contract term, . . . that unfairly frustrates the agreed common purposes and disappoints the reasonable expectations of the other party." Celador Intern. Ltd. v. Walt Disney Co., 347 F. Supp. 2d 846, 852 (C.D. Cal. 2004) (citations omitted).

Here, AT&T Services argues that plaintiff's implied covenant claim improperly attempts to expand plaintiff's contractual rights and preclude AT&T Services from

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES - GENERAL            'O'

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

exercising rights it expressly reserved under the U-verse Agreement.  In particular, AT&T Services notes that the U-verse Agreement places no obligations on it to maintain a certain number of subscribers or to take efforts to expand U-verse's subscriber base. AT&T Services also notes that, under the U-verse agreement, AT&T Services reserves the right to shut down the U-verse platform, in whole or in part, at any time.  See also Guz v. Bechtel Nat'l, Inc., 24 Cal. 4th 317, 349–50 (2000) (the implied covenant "cannot impose substantive duties or limits on the contracting parties beyond those incorporated in the specific terms of their agreement.").

However, plaintiff does not merely allege that AT&T Services failed to take adequate steps to expand U-verse's subscriber base or maintain existing subscribers; rather, plaintiff alleges that AT&T Services is deliberately taking steps to *reduce* the number of U-verse subscribers.  See Compl. ¶ 35 ("AT&T is now aggressively soliciting U-verse subscribers to move to DirecTV.").  For example, plaintiff contends that "using AT&T's  logo, DirecTV sent U-verse TV customers a solicitation offering money to move to DirecTV."  Id.  And plaintiff asserts that "AT&T has told U-verse subscribers that the networks or channels they have on U-verse will be available on DirecTV"—despite the fact that plaintiff's networks are not on DirecTV.  Id.  While this conduct may not be expressly forbidden by the terms of the U-verse Agreement, the implied covenant exists to "supplement[ ] the express contractual terms 'to prevent a contracting party from engaging in conduct which (while not technically transgressing the express covenants) frustrates the other party's rights to the benefits of the contract.' " Americanwest Bank v. Banc of California, 2014 WL 1347166, at *6 (C.D. Cal. Apr. 4, 2014) (citing Racine & Laramie, Ltd. v. Dep't of Parks & Recreation, 11 Cal. App. 4th 1026, 1031–32 (Cal. Ct. App. 1992)).  Per the U-verse Agreement, plaintiff's right to compensation is based entirely on the number of U-verse subscribers.  See Compl. ¶¶ 26, 108.  Thus, by taking steps to reduce the total number of U-verse subscribers—including by actively soliciting existing subscribers to move to a different platform—AT&T Services is frustrating plaintiff's rights to its per-subscriber license fees.  Accordingly, the Court finds that plaintiff has adequately stated a claim for breach of the implied covenant of good faith and fair dealing.  See also Fortaleza v. PNC Fin. Servs. Grp., Inc., 642 F. Supp. 2d 1012, 1021–22 (N.D. Cal. 2009) (in order to plead breach of the implied covenant, "a plaintiff must establish the existence of a contractual obligation, along with

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

conduct that frustrates the other party's rights to benefit from the contract."). The Court, therefore, DENIES AT&T Services' motion to dismiss this claim.[5]

### 3.    Plaintiff's Lobbying Claims

Plaintiff asserts three claims against defendants predicated on defendants' alleged promise that, if plaintiff publicly supported AT&T, Inc.'s acquisition of DirecTV, defendants would carry plaintiff's networks on DirecTV's platform ("the DirecTV Promise"). In particular, plaintiff asserts claims against defendants for: (1) promissory estoppel (claim five); (2) breach of oral contract (claim six); and (3) breach of implied in

---

[5] AT&T Services also contends that plaintiff's implied covenant claim violates the parol evidence rule. The parol evidence rule bars a plaintiff from using extrinsic evidence "to alter or add to the terms of [a fully integrated] writing." Riverisland Cold Storage, Inc. v. Fresno-Madera Prod. Credit Ass'n, 55 Cal. 4th 1169, 1174 (2013) (citing Cal. Code Civ. Proc. § 1856; Cal. Civ. Code § 1625); see also Masterson v. Sine, 68 Cal. 2d 222, 225 (1968) ("When the parties to a written contract have agreed to it as an 'integration'—a complete and final embodiment of the terms of an agreement—parol evidence cannot be used to add to or vary its terms.") (citations omitted). However, the parol evidence rule is inapplicable here. Plaintiff does not seek to add additional terms or alter the existing terms of the U-verse Agreement through its implied covenant claim; rather, the implied covenant is already implied into the U-verse Agreement as a matter of California law. See also Amloc Companies, Inc. v. Cypress Abbey Co., 2006 WL 1462908, at *7 (Cal. Ct. App. 2006) (unpublished) (parol evidence rule inapplicable where evidence was "not used to supplement or vary the terms of the [agreements]."). Moreover, the fact that the implied covenant may impose obligations on parties that are not expressly stated in their agreement does not change this analysis. Courts recognize that that implied covenant imposes on contracting parties an obligation to refrain from conduct which, while not expressly prohibited by the terms of a contract, nonetheless frustrates the other parties' bargained for expectations. See, e.g., Americanwest Bank, 2014 WL 1347166, at *6. This argument is, therefore, unavailing.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | | Date | July 25, 2016 |
|---|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | | |

fact contract (claim seven).[6]  Defendants contend that all three of these claims fail to state a claim upon which relief can be granted.

First, defendants argue that the Lobbying Claims are barred by a provision in the U-verse Agreement which states that the agreement "may only be amended or modified by a written agreement of both Parties."  Dkt. 17, Smith Decl, Ex. A, "U-verse Agreement", at 36 ¶ P.  Defendants contend that the Lobbying Claims attempt to modify the U-verse Agreement, which expressly states that defendants have no obligation to carry plaintiff's networks on later acquired platforms, such as DirecTV.  Defendants' further contend that, because the DirecTV Promise was, if anything, an oral agreement, it violates the provision of the U-verse Agreement requiring that all amendments or modification be in writing.  This argument mischaracterizes plaintiff's allegations.  Plaintiff does not contend that, in making the DirecTV Promise, defendants were proposing a modification of plaintiff's existing agreement.  Rather, plaintiff is alleging that defendants were proposing a *new* agreement, distinct from the U-verse Agreement.  See also Performance Plastering v. Richmond Am. Homes of Cal., Inc., 153 Cal. App. 4th 659, 671 (Cal. Ct. App. 2007) (contractual provision requiring that modifications be in writing was inapplicable where oral agreement was not a modification, but rather a separate contract); Bing Ting Ren v. Wells Fargo Bank, N.A., 2013 WL 2468368, at *4 (N.D. Cal. Jun. 7, 2013) (oral promise separate from any contractual provision was not a modification to written contract).  As such, the provision of the U-verse Agreement defendants rely upon is inapplicable.[7]

_____

[6] For simplicity and because these claims raise similar issues, the Court refers to these claims collectively as plaintiff's "Lobbying Claims."

[7] Defendants argue that plaintiff's are improperly characterizing the DirecTV Promise as a "new" contract when in reality it is nothing more than an attempted oral modification of the U-verse Agreement.  However, plaintiffs have alleged that their new DirecTV contract contained materially distinct terms from the U-verse Agreement.  For example, while as plaintiff received $0.18 per subscriber under the U-verse Agreement, it allegedly would have received $0.12 per subscriber under a DirecTV contract.  See Compl. ¶ 118.  Moreover, given that the U-verse Agreement expressly excused defendants from any obligation to carry plaintiff's networks on later acquired platforms, such as DirecTV, it arguably makes sense that the parties would need to form a new

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**                    **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

Second, defendants argue that, to the extent any agreement was formed by the DirecTV Promise, it is barred by California's statute of frauds. California Civil Code section 1624(a)(1) provides that "[a]n agreement that by its terms is not to be performed within a year from the making thereof" is invalid unless made in writing. Cal. Civ. Code § 1624(a)(1). Here, plaintiff alleges that, pursuant to the DirecTV Promise, defendants agreed that "DirecTV would carry both of Herring's networks, OAN and AWE . . . [for] a customary five-year term." Compl. ¶ 81. Thus, the statute of frauds applies to this agreement because, by its terms, it would require five years to complete. Nonetheless, Courts have recognized several exceptions to the statute of frauds. And, as relevant here, one of those exceptions applies when a party has rendered full performance under an oral agreement. See, e.g., Corvello v. Wells Fargo Bank, NA, 728 F.3d 878, 885 (9th Cir. 2013) ("Wells Fargo separately contends that the Lucias' breach of contract claim cannot survive the statute of frauds because it is an oral agreement to modify a mortgage. The Lucias, however, have alleged full performance of their obligations under the contract. They therefore may enforce the remaining promises."); Griffin v. Green Tree Servicing, LLC, 2015 WL 10059081, at *8 (C.D. Cal. Oct. 1, 2015) ("Under California law, full performance by the party seeking enforcement of an oral contract removes the contract from the statute of frauds.") (Morrow, J.). Here, plaintiff alleges that it fully performed it obligations under its agreement with defendants. Specifically, plaintiff alleges that it lobbied the FCC, the DOJ, and members of Congress, that it solicited other independent programmers to support the acquisition of DirecTV, and that it filed briefs in support of the acquisition, amongst many other activities. Plaintiff further alleges that it reported to one of AT&T Services' executives, James Cicconi, who gave plaintiff instructions on how it should support the acquisition, and plaintiff alleges that, ultimately, AT&T, Inc.'s acquisition of DirecTV was approved by the requisite regulatory bodies. Accordingly, under the terms of the parties' agreement, as alleged in the complaint, plaintiff has fulfilled its side of the bargain and thus the statute of fraud does not prevent plaintiff from enforcing the DirecTV Promise.[8] Finally, defendants allege that plaintiff has failed to

---

agreement providing carriage on DirecTV's platform. Accordingly, the Court finds that plaintiff has plausibly alleged that the parties intended the DirecTV Promise as a distinct contract from the U-verse Agreement.

[8] Defendants contend that plaintiff has not fully performed under the parties purported agreement. Specifically, defendants contend that, in order to fully perform,

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

adequately allege a clear and enforceable promise.  Under each of the Lobbying Claims, plaintiff must allege the existence of a promise that is clear and unambiguous in its terms.  See, e.g., US Ecology, Inc. v. State, 129 Cal. App. 4th 887, 901 (Cal. Ct. App. 2005) (elements of a promissory estoppel claim include "a promise clear and unambiguous in its terms"); Weddington Prods., Inc. v. Flick, 60 Cal. App. 4th 793, 811(1998) ("In order for acceptance of a proposal to result in the formation of a contract, the proposal must be sufficiently definite, or must call for such definite terms in the acceptance, that the performance promised is reasonably certain.").  Defendants contend that plaintiff has failed to allege the existence of a promise with the requisite specificity.  The Court disagrees.  In the complaint, plaintiff alleges that defendants "made a clear and unambiguous promise to Herring" that:

> if Herring used its status as an owner of two independent cable television networks to lobby in support of AT&T's acquisition of DirecTV, AT&T would provide Herring's networks with carriage on DirecTV post-Acquisition.  AT&T promised that Herring would receive $20 to $25 million per year, i.e., $0.12 per subscriber for 85% of DirecTV's subscribers, in licensing fees from DirecTV, including a five year term, as with Herring's existing [U-verse] Agreement with AT&T.

---

plaintiff was required to tender its channels to defendants for carriage on DirecTV.  However, as alleged in the complaint, the parties' agreement did not require plaintiff to tender its channels to defendants in order for defendants to become obligated to carry those channels on DirecTV.  Rather, plaintiff alleges that, pursuant to the DirecTV Promise, plaintiff agreed that in exchange for *lobbying* on defendants' behalf defendants would carry plaintiff's channels on DirecTV.  Here, plaintiff alleges that it fully performed its lobbying obligations under the DirecTV Promise.  Moreover, even assuming that plaintiff was required to tender its channels to defendants, there is no indication that plaintiff did not attempt to tender those channels—indeed, plaintiff alleges that it desired to place its channels on DirecTV and only engaged in the lobbying efforts alleged in the complaint so that it could place those channels on DirecTV.  And, in any event, defendants arguably frustrated plaintiff's ability to tender its channels by allegedly reneging on the DirecTV Promise and refusing to carry plaintiff's networks.  Accordingly, this argument is unavailing.

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

**CIVIL MINUTES - GENERAL**          **'O'**

| Case No. | 2:16-cv-01636-CAS-AGR | Date | July 25, 2016 |
|---|---|---|---|
| Title | HERRING NETWORKS, INC. V. AT&T SERVICES, INC., ET AL. | | |

Compl. 112.  Thus, plaintiff has alleged the existence of a promise that clearly sets forth plaintiff's own obligations (to support AT&T's acquisition of DirecTV), the obligations of defendants (to provide plaintiff's networks with carriage on DirecTV), the time for defendants' performance (post-acquisition of DirecTV), the method by which plaintiff would be compensated ($0.12 per subscriber for 85% of DirecTV's subscribers), and the length of the agreement (five years).  This is more than sufficient at the pleading stage.  See Alvarado v. Aurora Loan Servs, LLC, 2012 WL 4475330, at *3 (C.D. Cal. Sep. 20, 2012) ("[A] plaintiff can successfully plead a breach of contract claim by alleging the substance of its relevant terms."); see also 1 Witkin, Summary of Cal. Law, Contracts, § 137 (2005 10th ed.) ("The terms of a contract are reasonably certain if they provide a basis for determining the existence of a breach and for giving an appropriate remedy.") (quoting Rest. 2d Contracts, § 33).

Accordingly, the Court finds that plaintiff has adequately pleaded its Lobbying Claims and DENIES defendants motion to dismiss these claims.

## V.  CONCLUSION

In accordance with the foregoing, the Court **DENIES** AT&T, Inc.'s motion to dismiss for lack of personal jurisdiction and **DENIES** AT&T Services motion to dismiss for failure to state a claim upon which relief can be granted.

IT IS SO ORDERED

| | 00 | : | 00 |
|---|---|---|---|
| Initials of Preparer | | CMJ | |